DRAPER *v*. REGENTS OF UNIVERSITY OF MICHIGAN.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION LAW—BURDEN OF PROOF—COURSE OF EMPLOYMENT.

The burden rests upon the one claiming compensation under the workmen's compensation act (Act No. 10, Extra Session 1912) to show by competent testimony, direct or circumstantial, not only the fact of an injury, but that it occurred in connection with the alleged employment, and both arose out of and in the course of the service at which the injured party was employed.[1]

2. SAME—EVIDENCE—COURSE OF EMPLOYMENT.

In proceedings under said act against the Regents of the State University to recover compensation for the death of the superintendent of the University hospital, who was killed by a street car, which ran north of the campus, while he was either on his way home to his evening meal from the hospital, which was situated north of the street railway, or on his way to attend to business on the campus, evidence *held*, insufficient to sustain the burden of proof as to the occurrence of the accident during the course of his employment.[2]

[1]On the question of workmen's compensation acts generally, see extensive note in L. R. A. 1916A, 23, particularly as to injuries "arising out of and in the course of" the employment, see p. 232 of same note.

[2]As to recovery of compensation for injuries received while going to and from work, see note in L. R. A. 1916A, 331.

Certiorari to Industrial Accident Board. Submitted January 10, 1917. (Docket No. 87.) Decided March 30, 1917.

Alice Draper presented her claim for compensation against the Regents of the University of Michigan for the death of her husband in defendant's employ. From an order denying compensation claimant brings certiorari. Affirmed.

*Arthur Brown,* for appellant.

*Cavanaugh & Burke,* for appellee.

KUHN, C. J. The claimant's husband, Jay B. Draper, was, immediately prior to November 13, 1915, superintendent of the University hospitals at a salary of $2,500 a year. Mr. Draper frequently was required, in the course of his employment, to go to the University campus, which is situated about a quarter of a mile southeast of the University hospitals. In order to go to and from the campus it is necessary to cross the street car tracks running along the north side of the campus, on North University avenue. Mr. Draper's home was southeast of the campus, so that the campus was directly between his home and the University hospitals.

It is claimed that it was Mr. Draper's universal custom to take his noon and evening meals at the University hospitals, in the psychopathic ward, unless he was called home for some reason or unless he had business down town which took him away from the hospitals.

On November 13, 1915, he called up his home about 5 o'clock and said he would be home for the evening meal. Half an hour later he was almost instantly killed by a street car as he was about to enter the campus from the direction of the hospitals.

A claim was presented against the Regents of the University of Michigan, and considerable testimony was taken at the hearing. The arbitration committee and the industrial accident board held that the accident which caused Mr. Draper's death did not arise out of and in the course of his employment. We quote from the brief of counsel as the best way to present the claimant's contention:

"Did the accident arise 'in the course of' the employment? The answer to this question depends upon whether Mr. Draper was on his way from the hospitals to the campus to transact some matter of business there on his way home. If he was merely going home to dinner when killed, the accident would not be one in the course of his employment. But if he was intending to stop on the campus on a business errand and then go on home to dinner, the accident would be one in the course of his employment. We think the evidence shows that he had business on the campus to transact before going home, and that this evidence is undisputed and unimpeached.

"Mr. Draper had been superintendent of the hospitals for eight years. Mrs. Draper testified that never during that time had Mr. Draper left the hospital as late as 5 o'clock in the afternoon to come home to dinner unless he had business to transact on the way. It was seldom that he came home for the evening meal, sometimes not more than once in two or three weeks. He took his evening meals at the hospital unless business called him to the campus or down town, and this was his 'universal practice.' *  *  *

"It must be held, therefore, that a uniform custom to go home for his evening meal only when he had business to transact on the way, is conclusively shown by the evidence.

"The campus was situated between the hospitals and the home of the deceased; so that he could easily transact any business he might have on the campus while on his way home. On the night when he was killed it appears that he called up his home about 5 o'clock and informed his family that he intended to come home for dinner. No plans or arrangements at

home required his presence; for his telephone call was the first intimation the family had that he would come home that night. Hence, if he followed his custom, he must have planned to go home for dinner because he had business to look after on the campus, and since he was killed when about to enter the campus from the direction of the hospitals, he must have been on his way to look after that business when killed.

"Does the proof of a custom constitute *prima facie* evidence that an act was done pursuant to such custom? In other words, will evidence that deceased was accustomed to do a certain act be sufficient to show *prima facie* that he did it? The cases are very clear that evidence of a custom is competent to show the doing of an act coming within the custom"—citing cases.

We think counsel is claiming more for the record than it will justify.

Mrs. Draper was a witness. The following appeared in her testimony:

"*Q.* Did he ever come home to his noon or 6 o'clock meal?

"*A.* Yes, sir.

"*Q.* On what occasions?

"*A.* If he was having business down town or over on the campus at the noon hour or 6 o'clock he would come home.

"*Q.* Was that his universal practice as far as you know?

"*A.* Yes, sir.

"*Q.* Were there any days he came home to any of those meals unless he had business down town, at the bank, or at the campus that you know of?

"*A.* When he was to a game, to a ball game.

"*Q.* When he would be off duty in the afternoon, where would he have his meals? Would he come home? Suppose he had gone to a ball game?

"*A.* He would have his meals at home unless there was something that he had to go back to the office for.

"*Q.* Were there any other times when he came home to his meals other than when he had business at the campus or was down town?

"*A.* Not that I know of."

On the cross-examination she said:

"*Q.* Was your husband in the habit of coming home every Saturday afternoon?

"*A.* No, sir.

"*Q.* He was not obliged to work on Saturday afternoon?

"*A.* Well, that depended on his work. If he had work to do, he would work.

"*Q.* But usually he laid off Saturday afternoon to go to the ball games?

"*A.* If there were games or he had business down town he would go away; aside from that he would stay at the office and work."

She also said he did not attend the ball game on the afternoon when he was hurt.

Miss Burlingame testified in part:

"*Q.* Do you know where he had his 12 o'clock meal and his 6 o'clock meal?

"*A.* At psychopathic hospital.

"*Q.* Always?

"*A.* Not always. If called away, he went home to 6 o'clock dinner. During the football game season he would go home; also if he had business on the campus. Sometimes they called him from his residence, and then he would go home to the evening meal.

"*Q.* When he had business that called him away from the hospital and over to the campus, near his home, what was his custom?

"*A.* He had his meals at psycopathic hospital if his work kept him there until meal time.    *    *    *

"*Q.* Where was he going that afternoon?

"*A.* I think he was going home. He always took the same route going home as he did when he had business at the secretary's office or on the campus.

"*Q.* Did he have business that day?

"*A.* He was anxious to see President Hutchins and Secretary Smith, and they did not come while I was there.    *    *    *

"*Q.* If he had been going to see Secretary Smith or President Hutchins he would have taken this same route?

"*A.* Yes."

Miss Draper, a daughter of the deceased, was a witness. She testified in part:

"*Q.* What was his custom in regard to taking meals at the hospital?

"*A.* He had only two meals at the hospital, the noon meal and the 6 o'clock meal. The only times he did not eat at the hospital was when he came home, when he went on business to the campus, when he was called home, and when he might be attending some social engagement in the afternoon. That afternoon I do not know whether he had business.

"*Q.* What was his practice when he came home to meals?

"*A.* His universal practice was to call up home when he was coming home to a meal.

"*By Mr. Cavanaugh:*

"*Q.* On Saturdays if he worked at the hospital he had supper there? If he left in the middle of the afternoon what was his custom?

"*A.* I would say that the meals he had on Saturdays were about even at hospital and at home. He always took lunch at the hospital with the exceptions named."

It was shown by the president and the secretary of the University that they had no engagement with Mr. Draper that afternoon, and it was not shown that he had any appointment with the treasurer, nor was it shown what the nature of business down town would be, whether the private business of Mr. Draper or official business.

In *McCoy* v. *Screw Co.,* 180 Mich., at page 458 (147 N. W., at page 573, L. R. A. 1916A, 323), it is said:

"The burden of furnishing evidence from which the inference can be legitimately drawn that the injury arose 'out of and in the course of his employment' rests upon the claimant. *Bryant* v. *Fissell,* 84 N. J. Law, 72 (86 Atl. 458) ; 3 Negligence & Compensation Cases Annotated, p. 585. Ruegg on Employers' Liability and Workmen's Compensation, p. 343, says:

" 'If an inference favorable to the applicant can only be arrived at by a guess the applicant fails. The same thing happens

where two or more inferences equally consistent with the facts arise from them.' "

In *Hills* v. *Blair*, 182 Mich., at page 25 (148 N. W., at page 245), it is said:

"Under the provisions of this act only that employee is entitled to compensation who 'receives personal injuries arising out of and in the course of his employment.' It is to be borne in mind that the act does not provide insurance for the employed workman to compensate any other kind of accident or injury which may befall him. The language of the Michigan compensation law is adopted from the English and Scotch acts on the same subject, and, in harmony with their interpretations, has been construed by this court, in *Rayner* v. *Furniture Co.*, 180 Mich. 168 [146 N. W. 665, L. R. A. 1916A, 22, Am. & Eng. Ann. Cas. 1916A, 386], as meaning that the words 'out of' refer to the origin, or cause of the accident, and the words 'in the course of' to the time, place and circumstances under which it occurred.

"In *Ayr Steam Shipping Co., Ltd.,* v. *Lendrum,* 6 B. W. C. C. 326, involving a fatal accident attended with uncertainty as to details, the court said:

" 'I think one may deduce from the decisions (1) that the burden is always upon the applicant to prove that death resulted from an accident arising out of as well as in the course of the employment; (2) that such proof need not be direct, but may be by circumstantial evidence, but there must be facts from which an inference can be drawn, as distinguished from mere conjecture, surmise, or probability; and (3) that an award by an arbiter cannot stand unless the facts found are such as to entitle him reasonably to infer his conclusion from them.'

"It is contended by appellants that the facts proven here do not in reason support the inference of the board as to the manner in which deceased met his death, but, on the contrary, conclusively show that he was killed in an attempt to board or leave a moving train, precluding any award under the ruling in *Pope* v. *Hill's Plymouth Co.*, 5 B. W. C. C. 175, in which case a workman in a colliery going home to his dinner on the premises of his employer was killed in attempting to jump on a passing tram car. It is further urged

as a defense that, if it cannot be said as a matter of law a finding of fact should have been made as appellants contend, it should at least be held that the proven facts are equally consistent with either one of the two alternatives, and no inferences can legitimately be drawn to support an award.

"We are not prepared to hold that the findings of fact as to the manner of the accident are entirely without evidential support either direct or by inference. They are therefore to be taken as conclusive under the statute. Accepting them as such, do they sustain the conclusion of law that Hills' death arose out of and in the course of his employment?

"It is well settled that the burden rests upon the one claiming compensation to show by competent testimony, direct or circumstantial, not only the fact of an injury, but that it occurred in connection with the alleged employment, and both arose out of and in the course of the service at which the injured party was employed."

We cannot say as a matter of law that claimant met the burden of proof, and the findings of fact must therefore stand.

The judgment is affirmed.

Stone, Ostrander, Bird, Moore, Steere, and Brooke, JJ., concurred. Fellows, J., did not sit.