NIGHTLINGER v. GIANT SUPER MARKET, INC.

1. WORKMEN'S COMPENSATION—BURDEN OF PROOF.
    The burden of proving a right to workmen's compensation is
    on the party asserting that right.

2. SAME—COMMISSION—GUESS—INFERENCES.
    The workmen's compensation commission may not indulge in
    the assumption of a mere possibility in the nature of a guess
    as to whether a plaintiff is entitled to compensation but it
    may draw reasonable inferences from established facts.

3. SAME—FINDINGS OF FACT—SUPREME COURT.
    Findings of fact and legitimate inferences drawn from estab-
    lished facts as found by the workmen's compensation com-
    mission are binding upon the Supreme Court (CL 1948, § 413.-
    12).

4. SAME—OSTEOGENIC SARCOMA—AMPUTATION OF LEG—PROXIMATE
    CAUSE—REPEATED TRAUMA.
    Record in proceeding to recover workmen's compensation which
    showed plaintiff's leg was amputated above the knee because
    of osteogenic sarcoma near the knee joint but failing to
    show such tumor was caused by repeated trauma while
    plaintiff was at work as a packer at checking counter in
    grocery did not support finding of fact as to proximate cause
    even with testimony showing that some pathologists were
    of the opinion such traumas might have something to do with
    that type of tumor.

Appeal from Workmen's Compensation Commis-
sion. Submitted April 18, 1952. (Docket No. 92,
Calendar No. 45,398.) Decided June 2, 1952.

REFERENCES FOR POINTS IN HEADNOTES

[1] 58 Am Jur, Workmen's Compensation § 433.
[2] 58 Am Jur, Workmen's Compensation § 450.
[3, 4] 58 Am Jur, Workmen's Compensation § 530 et seq.

John Nightlinger presented his claim for compensation against Giant Super Market, Inc., employer, and State Accident Fund, insurer, for injuries sustained while in its employ. Award to plaintiff. Defendants appeal. Reversed and remanded for entry of award for defendant.

*Currie & Currie* and *Gilbert A. Currie, Jr. (Weston L. Sheldon,* of counsel), for plaintiff.

*Harry F. Briggs (Stanley Dodge,* of counsel), for defendants.

SHARPE, J.   This is an appeal by the employer and the insurer from an award of compensation to plaintiff, John Nightlinger.

The essential facts are as follows:   Plaintiff worked as a grocery packer. for defendant, Giant Super. Market, Inc., from June, 1949, until June 17, 1950.   He only worked on Thursdays and Fridays from 4:30 p. m. to 9 p. m., and all day on Saturday. He was 18 years of age, and a student in school.

In his job as a grocery packer he stood at a stand, the top of which was 22 inches above the floor, and part of the time he stood with his feet turned out and the inside of his knees pressing against the top of the stand.   At times his knees bumped the top of the stand.   Plaintiff noticed some redness on the knee when he first worked for defendant.   Plaintiff did not have any medical attention for the knee until June 26, 1950, when he consulted Dr. Donald C. Durman.   He informed Dr. Durman at that time that the pain and swelling in the vicinity of the right knee had been present for about a month.   On June 26, 1950, Dr. Durman found "a swollen area on the right leg, on the inner aspect of the leg, just below the knee, which was red, very tender to pressure,

hard, firm." The swollen area extended from the upper end of the tibia down a distance of 2 or 3 inches on the inner side of the leg. Dr. Durman made a diagnosis of osteogenic sarcoma of the tibia. The leg was amputated at the lower third of the thigh on July 24, 1950. After the operation it was diagnosed as a "Periesteal osteofibrochondro sarcoma," which appears in young people more often than in older people.

On November 28, 1950, plaintiff filed an application for hearing and adjustment of claim with the workmen's compensation commission. The deputy commissioner granted plaintiff an award of $18.66 per week for total disability for the specific loss of a leg for a 200-week period, together with an amount for medical expenses. Upon appeal the commission affirmed the award, based upon the following taken from an opinion filed in the cause:

"We recognize that the causes for the various types of cancer are not definitely known. We also recognize that medical men differ in their opinion, as Dr. Durman indicated, as to whether trauma can be a factor in development of cancer. However, we do not feel inclined to categorically conclude that trauma is not a factor in the development of cancer simply because the causes of cancer are not definitely established or because medical men are in disagreement on the relation of trauma to cancer. We think each case must be decided on its facts. In the instant case plaintiff had never had any trouble with his right leg prior to his employment by defendant company. In the course of his employment he repeatedly bumped his right leg on the counter and a redness appeared at the site of the repeated bumping. The red area was caused by the repeated bumping of the leg against the counter. He felt a pain in his right leg after working for 3 or 4 months. Later a swelling appeared on the leg in the area where it was bumped against the counter. Finally

the malignant tumor developed at that spot. To exclude the repeated bumping as a causative factor for the tumor, we would have to disregard those undisputed facts and conclude that the repeated trauma and the formation of the tumor in the very area which was subjected to the trauma were purely coincidental. We do not believe such a conclusion is justified because the symptons first appeared following trauma to the leg and progressed with the repeated trauma. In our opinion it is more reasonable to conclude that the repeated trauma was a factor in the development of the sarcoma and we so find."

Defendants appeal and urge that plaintiff failed to show competent evidence that he received a personal injury arising out of and in the course of his employment.

Plaintiff testified:

"*Q.* John, you worked for the Giant Super Market and when did you first begin your employment with them? Just approximately?

"*A.* Approximately June, 1949.

"*Q.* What were your duties? What did you do in working for the Giant Super Market?

"*A.* I was a packer.

"*Q.* Would you please explain just what you mean by a packer?

"*A.* A packer you got to—you have a checker unload the groceries from the over-stand and the packers stack them up and put them in boxes.  *  *  *

"*Q.* And would you just explain just what that picture is of your stand, where they come up, where the cash register is?

"*A.* They have a high place there where they set the canned goods and food, and groceries, on the stand and down below they have a place where they set groceries on the side, a little lower.  *  *  *

"*Q. The Commissioner:* What did you say about the inside of your leg?

"*A.* I said the inside of your leg hits the counter.

\* \* \*

"*Q.* Describe to us, as you are operating what we will call the checkout counter, would you just describe what your process is in packing these groceries?

"*A.* Well, in order to get up close to it and reach, your left leg was down on the floor and sort of bringing your right leg up where it cuts on the corner-shaped counter, sort of a sharp corner there.

"*Q.* Are you talking about the top of the stand?

"*A.* The top of the lower part of the stand.

"*Q.* Can you tell us how high this part where you are working is?

"*A.* Approximately about 22 inches.

"*Q.* John, what is your height?

"*A.* My height is about 5 feet, 9 1/2.

"*Q.* And when did you first notice any sign or trace of your injury complained of?

"*A.* When I complained.

"*Q.* When did you first notice any sign of it?

"*A.* Well, it was sort of reddish skin for quite a while back.

"*Q.* What do you mean by that?

"*A.* When I first started working there it was reddish.

"*Q.* Then what was the next indication you had of injury?

"*A.* Well, it started swelling.

"*Q.* And when would you say that was?

"*A.* Well, approximately 2 months before the operation."

Dr. Donald C. Durman, a witness produced by plaintiff, testified:

"*Q.* When did you first see him?

"*A.* June 26, 1950.

"*Q.* And did you examine him at that time?

"*A.* Yes.

"*Q.* Will you tell us what you found?

"*A.* I found a swollen area on the right leg, on the inner aspect of the leg, just below the knee, which was red, slightly red, very tender to pressure, hard, firm.

"*Q.* Which knee was that?

"*A.* The right knee.   *   *   *

"*Q.* Now, what did you do after you located this?

"*A.* Made an X-ray examination of the leg.   *   *   *

"*Q.* And will you tell us what you found in these X-rays?

"*A.* On the anterior posterior view the femur and tibia and fibula are normal.  The knee joint itself, the knee joint space is normal.  On the tibia, on the medial condyle there is an area of decreased density of the bone, and just below it there is an area of rather marked increase in density of the bone and' at that point on the surface of the bone, due to the level of the epithelial plate or line, there is an area of destruction of the cortex of the bone.  The lateral view shows normal appearance of the femur, patella and fibula, but also shows this area of diminished density of the upper portion of the tibia and shows below it an irregular area of marked increased density of bone.

"*Q.* What does this area and existence of bone indicate to you?

"*A.* Indicates increased density of calcium in 'the bone from some cause or other.   *   *   *

"*Q.* What was your diagnosis?

"*A.* Osteogenic sarcoma of the tibia.

"*Q.* Will you tell us laymen just what that means so we can understand it?

"*A.* It is a malignant tumor of the bone.

"*Q.* Where did you find that malignant tumor on the bone, was it on the outer surface or inner or both?

"*A.* Both and inside the bone.  It had gone through the cortex and the tumor tissues outside of the bone in the soft tissues had radiated from the outside in. You couldn't tell at the time where it had originated.
*   *   *

"*Q.* Where did you amputate the leg?

"*A.* Lower 1/3 of the thigh.

"*Q.* Is there some reason why you went that high?

"*A.* The first is that this tumor was very close to the joint, so that in order to be sure of getting above it we would have to get above the knee.  *  *  *

"*Q.* Now, Doctor, based upon the history given you, and the condition that you found there, the malignant condition you found there, and your examination and your diagnosis of that condition, can you tell us whether there might be or could be a causal relationship between the malignant condition found and the injury complained of by the boy?

"*A.* I don't know.

"*Q.* Would you say there could be or might be a causal relationship there?

"*Mr. Dodge:* After the Doctor has answered as he did it is speculation.

"*Mr. Sheldon:* I can speculate on it, I think.

"*The Commissioner:* He may answer.

"*A.* It is the opinion of a good many pathologists that repeated trauma or injury to a certain area over a long period of time may have something to do with the development of this type of tumor, but, on the other hand, I think there are probably an equal number of very competent pathologists that say it has no causal relationship whatever.

"*Q.* Well, are you telling us that there could be a causal relationship?

"*A.* I really don't know.

"*Q.* Well, I am not asking you whether there would be; I am asking you whether there could be?

"*A.* Well, I suppose it is possible to conceive of repeated bumping producing enough stimulation of the tissues or change in the tissues so that some abnormal growth might take place. That is about as near as I can answer that question.

"*The Commissioner:*  *  *  *  Is there anybody actually knows what brings on these cancers, or sarcomas?

"*A.* I don't believe so.

*"By the Commissioner:* Your position is, in this, that this change could occur by a series of traumas but as to whether it did you, yourself, have no knowledge and are not able to tell us?

*"A.* That is right.   \*   \*   \*

*"Q.* What does the pathological report show as to the depth of it?

*"A.* He says, 'Sections show an inflamed or infected considerable portion proximal end of the bone extending for a distance of 2 or 3 centimeters under the cortex.' "

Plaintiff bases his claim for compensation on testimony showing repeated trauma followed by a tumor in the area where the trauma occurred, and the testimony of Dr. Durman, who testified:

"Well, I suppose it is possible to conceive of repeated bumping producing enough stimulation of the tissues or change in the tissues so that some abnormal growth might take place. That is about as near as I can answer that question."

The burden of proving a right to compensation is on the party asserting that right, see *Veek* v. *Wesley Freight Co.,* 306 Mich 485. In awarding compensation the commission may not indulge in the assumption of a mere possibility in the nature of a guess as to whether plaintiff is entitled to compensation, see *Ginsberg* v. *Burroughs Adding Machine Co.,* 204 Mich 130, but the commission may draw reasonable inferences from established facts; see *Standard Drug Store* v. *A. E. Wood & Co.,* 227 Mich 333.

In *Featherly* v. *Central Paper Co.,* 281 Mich 562, plaintiff fell and injured himself in September, 1933. He continued to work until August, 1935, when it was found that he had osteo sarcoma, which caused total disability. We approved the following taken from an opinion of the department:

"The department has carefully reviewed the medical testimony offered to show a causal relationship between the accident and the disability and the most that may be said is that there is a possibility that the accident might have had some connection with the disability. All the doctors admit that the cause of osteo sarcoma is unknown; that osteo sarcoma may occur without trauma; that osteo sarcoma is the cause of plaintiff's disability. 'Legal liability may not be predicated on mere guess or probability. *Draper* v. *Regents of University of Michigan*, 195 Mich 449.' *Rubin* v. *Fisher Body Corp.*, 205 Mich 605."

It is also the rule that the findings of fact and legitimate inferences drawn from established facts as found by the department are binding upon the Supreme Court.* See *Shaw* v. *General Motors Corp.*, 320 Mich 338. In the case at bar plaintiff testified that when he first started working for Giant Super Market, the subsequent traumatic area was "reddish," and that while at work he had a series of traumas at or near the swollen place on his leg. Whether there is proof of a causal connection between the trauma and the subsequent cancerous condition depends upon the testimony of Dr. Durman, who testified that he did not know whether there could be a causal relationship between the malignant condition found and the injury complained of.

He also testified that it is the opinion of many pathologists that repeated trauma to a certain area over a long period of time may have something to do with this type of tumor. It also appears that the following questions and answers were given:

"*By the Commissioner:*

"*Q.* Your position is, in this, that this change could occur by a series of traumas but as to whether

---

* See CL 1948, § 413.12 (Stat Ann 1951 Cum Supp § 17.186).— REPORTER.

it did you, yourself, have no knowledge and are not able to tell us?

"*A.* That is right."

The only reasonable interpretation of the doctor's testimony is that he does not know whether there is a causal relationship between the malignant condition and the injury suffered. His testimony of what some pathologists believe is not testimony upon which an award can be anchored. In granting an award the commission had to find that there was a causal connection between the injury and the resulting condition of plaintiff's leg. The record does not support such a finding of fact. The failure of plaintiff to furnish evidence from which the inference can be legitimately drawn that the injury resulted in the later amputation precludes the granting of an award. The case is remanded for entry of an order denying compensation. Defendant may recover costs.

NORTH, C. J., and DETHMERS, BUTZEL, CARR, BUSHNELL, BOYLES, and REID, JJ., concurred.