HASKE v TRANSPORT LEASING, INC, INDIANA

BAILEY v LEONI TOWNSHIP (AFTER REMAND)

Docket Nos. 102444, 103299. Argued January 14, 1997 (Calendar Nos. 1-2). Decided July 30, 1997. Rehearings denied 456 Mich 1202.

Andrew Haske was injured in the course of his employment with Transport Leasing, Inc., Indiana. He did not return to work because he was unable to perform required heavy lifting. Thereafter, he began working for Woodlands Harvesting, but had to stop because the job was too difficult for him as a result of his injury. Later, he worked for Enterprise Leasing as a road driver, earning considerably less than at either previous job. Haske then sought worker's compensation. A magistrate granted benefits, finding Haske totally disabled from the time of his injury at Transport Leasing until he found work with Woodlands Harvesting and, thereafter, partially disabled. The Worker's Compensation Appellate Commission reversed, finding that Haske had not suffered a loss of wage-earning capacity because he was still able to perform work within his qualifications and training. The Court of Appeals, SAWYER, P.J., and BANDSTRA and R. B. BURNS, JJ., reversed in an unpublished opinion per curiam, and remanded the case to the WCAC to determine whether the award of benefits was supported by competent, material, and substantial evidence (Docket No. 167920). Transport Leasing appeals.

John Bailey was injured in the course of his employment as a firefighter with Leoni Township. He later returned to work, performing restricted duty. In addition, he was self-employed as a part-time electrical contractor. After neck surgery and a period of convalescence, the township informed him that there was no restricted work available for him and that he was no longer an employee. Thereafter, Bailey resumed work part-time as an electrical contractor, and sought worker's compensation. A magistrate awarded him reasonable and related medical expenses for his injury, but denied worker's compensation. The Worker's Compensation Appellate Commission modified the hearing referee's decision, finding that Bailey was impaired in his work as a firefighter and, consequently, had suffered a limitation of his wage-earning capacity. The Court of Appeals, TAYLOR, P.J., and CAVANAGH and SHEPHERD, JJ., denied leave

to appeal (Docket No. 137154). The Supreme Court remanded the case to the Court of Appeals as on leave granted, 441 Mich 902 (1992). The Court of Appeals, NEFF, P.J., and MARILYN KELLY and P. R. JOSLYN, JJ., affirmed in an unpublished opinion per curiam (Docket No. 160469). Leoni Township appeals.

In an opinion by Justice BOYLE, joined by Chief Justice MALLETT, and Justices CAVANAGH and KELLY, the Supreme Court *held*:

A disability is a personal injury or work-related disease that prevents an employee from performing any work, even a single job, within the employee's qualifications and training under MCL 418.301(4); MSA 17.237(301)(4). An employee also must prove wage loss in order to establish a compensable disability by demonstrating that, as a consequence of work-related injury or disease, a reduction in earning capacity has been suffered. The amount of benefits is based on the employee's actual wage loss. Absence of residual earning capacity is not part of the threshold definition of disability.

1. In determining under subsection 301(4) whether an employee is entitled to worker's compensation, two inquiries are relevant: whether the employee proved the existence of a disability and whether that disability resulted in wage loss. Proof of a disability does not establish a presumption of wage loss. In order to prove wage loss the employee must demonstrate a reduction in earning capacity. An employee who no longer can perform a job suitable to qualifications and training as a result of injury is disabled. Total disability arises from an injury when an employee proves an inability to perform all work suitable to qualifications and training as a result of injury. Partial disability arises when an employee proves an inability to perform a single position within qualifications and training.

2. Unemployment or reduced wages must be causally linked to work-related injury, and a plaintiff may not reject, avoid, or refuse actual wages reasonably offered. Where unemployment of a partially disabled employee is found to be directly attributable to a compensable injury, maximum benefits may be awarded. It is not part of the plaintiff's burden in proving disability that other factors are not the cause of unemployment. The plaintiff need not prove a theoretical ability to earn after the injury, that other factors are not the cause of unemployment, or that the amount of residual capacity is diminished. If the magistrate credits testimony that there is a direct link between wages lost and a work-related injury, the plaintiff need not prove anything additional. *Sobotka v Chrysler Corp (After Remand)*, 447 Mich 1 (1994), furnishes no authority for the proposition that plaintiffs must prove absence of residual earning

capacity, i.e., an inability to earn the same wages when considering all the jobs within qualifications and training. Except as otherwise indicated, subsection 301(5) does not require an adjustment of benefits on the basis of existence of a residual wage-earning capacity. Whether disability is total or partial, actual loss of wages causally linked to a work-related injury is loss of wage-earning capacity.

3. In *Haske*, the WCAC determined that the plaintiff was not disabled, using an erroneous definition of disability. Because the magistrate applied the correct legal standard and found the causal link between the plaintiff's injury and his postinjury loss in wages, remand to the WCAC is required for further proceedings to determine if there was competent, substantial, and material evidence to support the magistrate's decision. In *Bailey*, the WCAC applied the correct legal definition of disability, but erred in awarding benefits, requiring remand to the magistrate for a determination regarding whether the plaintiff has factually proven disability and for further proceedings.

*Haske* affirmed.

*Bailey* remanded for further proceedings.

Justice WEAVER, joined by Justice BRICKLEY, concurring in part and dissenting in part, stated that the plain language of section 301(4) defining disability in the worker's compensation act is composed of two inquiries: whether there is a work-related injury or disease and whether that work-related injury or disease resulted in a limitation in an employee's wage-earning capacity in work suitable to the employee's qualifications. The employee has the burden of proof with respect to both inquiries. In these cases there is no dispute regarding the existence of work-related injuries.

A limitation is some factor in a person's makeup that restricts the scope of the person's activity or accomplishment. While limitations may be purely physical, it would be inconsistent with the plain language of subsection 301(4) to conclude that the Legislature intended "a limitation" to mean nothing more than a physical limitation because the words "a limitation" cannot be considered separately from their restrictive clauses "of an employee's wage earning capacity in work suitable to his or her qualifications and training." To prove that a disability exists, the statute requires proof of both a work-related injury or disease and "a limitation in an employee's wage earning capacity in work suitable to his or her qualifications and training." Thus, the employee must prove more than the work-related disease or injury.

The Legislature restricted consideration to work suitable to an employee's qualifications and training. Where an employee is qualified and trained in more than one job, wage-earning capacity

includes consideration of all jobs under the plain meaning of subsection 301(4). Whether "a limitation" exists in an individual's wage-earning capacity where that individual is qualified and trained in more than one job therefore requires consideration of the effect of the work-related disease or injury on earning capacity in all jobs in which the individual is qualified and trained. The statute does not state or imply that inability to perform one job within the individual's qualifications and training necessarily results in a limitation in wage-earning capacity. What work is suitable obviously will depend on the qualifications and training of the employee in each case. The reference to an employee's qualifications and training restricts the types of employment that can be considered to determine wage-earning capacity. It would be inconsistent with the language of the clause to find that an injured electrician's wage-earning capacity included menial labor or unskilled labor. Nor would it be consistent to assume that the electrician could maintain wage-earning capacity by adopting a new career requiring some additional training.

The second sentence of subsection 301(4) means that an injury resulting in a limitation in wage-earning capacity will not always result in a wage loss or entitlement to benefits. While there may be some redundancy of proof required for a limitation of wage-earning capacity under subsection 301(4) and the proportionate extent of impairment of the employee's earning capacity under subsection 371(1), the two provisions are not identical in meaning. Subsection 301(4) arguably encompasses a wider range of potential employments than subsection 371(1), because subsection 371(1) expressly limits the wage-earning calculation to those employments actually worked at the time of the injury.

In *Bailey*, the plaintiff was qualified and trained as a firefighter and electrical contractor at the time of the injury. In order to prove disability under the act, he needs to prove that his firefighting injury caused a limitation in wage-earning capacity as both a firefighter and an electrical contractor. A limitation in wage-earning capacity is not presumed simply because he can no longer fight fires; rather, he must show that he has a limitation in his combined wage-earning capacity as a firefighter and electrical contractor. The plaintiff has not proven a disability. However, it is appropriate to remand the case to the magistrate to make additional record regarding the plaintiff's wage-earning capacity as an electrical contractor to determine whether the loss of firefighting income caused a limitation in wage-earning capacity and thus a disability eligible for benefits under subsection 301(4).

In *Haske,* the plaintiff was qualified and trained as a truck driver. After his work-related injury, he eventually continued to work as a truck driver. However, physical restrictions resulting from his work-related injury may have affected his wage-earning capacity as a truck driver. It is unclear whether he was able to earn as much as he earned after the injury with the injury-related restriction as he earned before. On the proofs presented, he is not partially disabled. Therefore, in order to be found disabled and eligible for benefits, he must demonstrate that his wage-earning capacity as a truck driver was limited as a result of the work-related injury. The case should be remanded to the WCAC for additional findings of fact from the record regarding the plaintiff's wage-earning capacity as a truck driver after the injury to determine whether he is eligible for benefits under subsection 301(4).

Justice RILEY, concurring in part and dissenting in part, stated that the three-part test identified by the majority from *Sobotka,* operates to displace completely the two-step analysis envisioned by the Legislature and wrongly lowers the threshold of proof necessary to demonstrate a loss of earning capacity. There is no basis in the statute for allowing this standard to replace the legislatively established one, i.e., that the employee must prove a disability and then a reduction of earning capacity.

In *Haske,* the WCAC applied the wrong definition of disability in reversing the magistrate's grant of benefits for a partial disability. However, it found that the employee suffered no loss in earning capacity and, thus that the employee would have suffered no wage loss as measured by the reduction of his earning capacity. Nevertheless, the WCAC's finding did not consider whether the jobs that the employee was performing were equally well paying or whether there were available jobs at his previous wage that the employee could perform when it determined that he suffered no loss of wage-earning capacity. Therefore, the Court of Appeals decision to remand to the WCAC should be affirmed.

In *Bailey,* although the WCAC wrongly concluded that the magistrate found a partial disability, remand should not be required. The magistrate found that the plaintiff had never testified that he could not find employment as an electrician or that he even sought such employment. As a self-employed professional, this kind of testimony would be critical for establishing a prima facie case that the injury impaired his earning capacity. The plaintiff failed to provide evidence that he suffered a loss in what he is able to earn after the personal injury as an electrical contractor. Therefore, the magistrate properly denied him benefits. The WCAC erred regarding a legal question by failing to consider whether the plaintiff had proven a

wage loss. The Court of Appeals also erred in affirming that decision. Therefore, the decisions of the WCAC and the Court of Appeals should be reversed and the magistrate's refusal to grant benefits reinstated.

WORKER'S COMPENSATION — DISABILITY — WAGE LOSS.

A disability is a personal injury or work-related disease that prevents an employee from performing any work, even a single job, within the employee's qualifications and training under MCL 418.301(4); MSA 17.237(301)(4); an employee also must prove wage loss in order to establish a compensable disability by demonstrating that, as a consequence of work-related injury or disease, a reduction in earning capacity has been suffered; the amount of benefits is based on the employee's actual wage loss; absence of residual earning capacity is not part of the threshold definition of disability.

*Fred E. Foster* for plaintiff Haske.

*Kelman, Loria, Downing, Schneider & Simpson* (by *James P. Harvey*) for plaintiff Bailey.

*Smith & Brooker, P.C.* (by *Francis B. Drinan*), for the defendant in *Haske*.

*Richard R. Weiser* for the Accident Fund Company.

Amici Curiae:

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Morrison Zack*, Assistant Attorney General, for Jack F. Wheatley, Director of the Michigan Bureau of Worker's Disability Compensation.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *George H. Weller*, Assistant Attorney General, for the State of Michigan.

*Lacey & Jones* (by *Gerald M. Marcinkoski*) for *Rea v Regency Olds/Mazda/Volvo*.

*Conklin, Benham, Ducey, Listman & Chuhran,
P.C.* (by *Martin L. Critchell*), for Michigan Self-
Insurers' Association.

*Clark, Hill, P.L.C.* (by *Duane L. Tarnacki* and
*J. Walker Henry*), for Michigan Manufacturers
Association.

*Daryl Royal* for Michigan Trial Lawyers
Association.

BOYLE, J. In this appeal, we are asked to review the
Legislature's definition of disability in chapter 3 of the
worker's compensation act, MCL 418.301 *et seq.*; MSA
17.237(301) *et seq.* We hold that a disability is a per-
sonal injury or work-related disease that prevents an
employee from performing any work, even a single
job, within his qualifications and training under MCL
418.301(4); MSA 17.237(301)(4). We also conclude
that an employee must also prove wage loss in order
to establish a *compensable* disability. To prove wage
loss, an employee demonstrates that, as a conse-
quence of work-related injury or disease, he has suf-
fered a reduction in his earning capacity. The amount
of benefits is based on the employee's actual wage
loss.

In application, these basic principles operate to
require that an employee must establish (1) a work-
related injury, (2) subsequent loss in actual wages,
and (3) a causal link between the two. Proof of the
three elements will establish that an employee can no
longer perform at least a single job within his qualifi-
cations and training, thus satisfying the first sentence
of subsection 301(4), *and* that he has suffered a loss
in wages, satisfying the second sentence of subsec-

tion 301(4).[1] Consistent with the language of subsection 301(4) proofs sufficient to permit the magistrate to find that the subsequent wage loss is attributable to the work-related injury establish a compensable disability. Absence of residual earning capacity is not part of the threshold definition of disability.[2]

In *Haske v Transport Leasing, Inc*, we hold that the Worker's Compensation Appellate Commission applied the wrong definition of disability in reversing the magistrate's grant of benefits for a partial disability. We affirm the Court of Appeals decision and remand to the WCAC to determine whether the award of benefits was supported by competent, material, and substantial evidence on the record.

In *Bailey v Leoni Twp*, the magistrate found that Bailey did not produce evidence that he suffered a loss of his earning capacity, but did so only in the context of applying an erroneous definition of disability. The WCAC applied the proper definition of disability and calculated benefits, but incorrectly stated that the magistrate found as fact that the employee was partially disabled. The Court of Appeals affirmed the decision of the WCAC. Thus, both appellate tribunals applied the correct definition of disability, but neither recognized that the magistrate did not make a factual

---

[1] While the dissent suggests that the Legislature intended to reject this approach, there is no clear indication of legislative intent supporting this construction. Moreover, the amendment of the retiree presumption, MCL 418.373; MSA 17.237(373), clearly demonstrates that the Legislature knew how to accomplish the result advocated by the dissent and did not apply it to nonretirees. Thus, it strains logic to conclude that subsection 301(4)'s "plain language," *post* at 666, dictates the result advocated by the dissent.

[2] Absent postinjury employment establishing a new wage-earning capacity, benefit levels are not to be reduced by the proportionate impairment of residual wage-earning capacity.

finding of disability. We remand to the magistrate for further findings consistent with this opinion.

FACTS AND PROCEEDINGS

*HASKE v TRANSPORT LEASING*

Plaintiff Andrew Haske worked for defendant Transport Leasing as a tractor-trailer driver. On May 18, 1987, he was injured in the course of his employment when his truck tipped over. He suffered injuries to his left arm and leg, and to his neck, which prevented him from engaging in heavy lifting. Haske did not return to Transport Leasing because he was unable to perform the heavy lifting associated with the job. On January 27, 1988, Haske began working for Woodlands Harvesting, driving a truck and hauling woodchips, gravel, and rocks. However, he had to stop working in early October, 1988 because the job also required heavy lifting that was too difficult for him as a result of his injury. On October 10, 1988, he began working for Enterprise Leasing as a road driver. He said this job was "easy" and that his injury did not prevent him from performing it effectively. In fiscal 1990, he earned approximately $10,500 at this job. His average weekly wage at Transport Leasing had been $596.75 a week, or approximately $31,045 a year, and he had earned $377.99 a week with Woodlands Harvesting, or approximately $19,760 a year.

Haske filed a claim for worker's compensation in December, 1987. In the opinion dated October 28, 1991, the magistrate granted him an open award of $239.46 in weekly payments of worker's compensation as a partial disability payment. By an amended order, the magistrate increased this payment by $117.63 a week. The magistrate found that Haske was

totally disabled from the time of his injury, May 18, 1987, until he found work with Woodlands Harvesting on January 27, 1988, and thereafter that he was partially disabled.

Transport Leasing appealed to the WCAC. In a two to one decision, the WCAC reversed the grant of worker's compensation payments, except for the payments he received for the time he was totally disabled:

> [W]e believe that the Magistrate improperly focused on plaintiff's physical limitations as opposed to the limitations on his wage-earning capacity. MCL 418.301(4) [MSA 17.237(301)(4)]. The relevant inquiry is whether plaintiff has the ability to work at any other type of job by virtue of his qualifications and training. A physical limitation is not the equivalent of a "limitation of an employee's wage-earning capacity," because wage-earning capacity is not necessarily defined by physical ability alone. [1993 Mich ACO 1300, 1302.]

Thus, the WCAC found that Haske had not suffered a loss of wage-earning capacity because he "[was] still able to perform work within his qualifications and training" as evidenced by his subsequent employments. *Id.*

The Court of Appeals granted leave to appeal and reversed and remanded in an unpublished per curiam opinion:

> Although the WCAC majority correctly noted that physical limitation is not necessarily dispositive of wage earning capacity, it incorrectly concluded that plaintiff could suffer no loss of wage earning capacity as long as he remained capable of performing any work suitable to his qualifications and training. To the contrary, the relevant inquiry is whether there are any jobs suitable to plaintiff's qualifications and training which he is no longer fully capable of

performing as a result of his work injury, not whether there
are any other jobs suitable to his qualifications and training
which he is still capable of performing. [Issued March 2,
1995 (Docket No. 167920).]

The Court of Appeals remanded the case to the WCAC
for a determination whether the magistrate's award
was supported by competent, material, and substan-
tial evidence on the record.

Transport Leasing appealed in this Court, and we
granted leave to appeal.[3]

*BAILEY v LEONI TWP*

Plaintiff John Bailey worked as a firefighter for
defendant Leoni Township beginning in 1966. On
July 21, 1987, he was injured while attempting to pull
a driver from a vehicle, suffering sharp pain in his
neck and shoulder. Bailey stopped working as a result
of the injury in September 1987. On November 8,
1987, he returned to work, performing restricted duty
of inspecting buildings. He continued to work until
March 1988. While working for Leoni Township, Bai-
ley also worked as a self-employed, part-time electri-
cal contractor.

In May, 1988, Bailey had surgery performed on his
neck, removing a disk and fusing one of the neck
bones. In September 1988, Dr. Rawal sent a note to
Leoni Township regarding Bailey's physical condition.
The township responded that the only work available
was full duty, as opposed to light duty, and, conse-
quently, that there was no work available for Bailey.
After Bailey exhausted his sick leave with the town-
ship, the township informed him that he was no

[3] 451 Mich 896 (1996).

longer an employee. In 1987, Bailey had been working a day or two a week as an electrical contractor, and, after convalescing from his surgery, he resumed his work in 1988 as an electrical contractor, now working approximately three days a week.

In June, 1988, Bailey sought worker's compensation. In an opinion dated November 27, 1989, the magistrate awarded him only "reasonable and related medical expenses" for his injury, but denied him weekly benefits:

> Plaintiff has two suitable, skilled [employments] for which he is qualified[—]electrician and fireman. Even if he is unable to continue to work as a fireman, does he have a loss of wage-earning capacity if he is still able to work full time as a[n] electrician[?] No.
>
> I believe this is precisely the situation the new definition of disability was enacted to address. Here is a man with two skills—fireman and electrician. Even if [he] is unable to perform one skill, he is still able to do the other. The fact that he is self-employed, works an average of 3 days per week, and earns for tax purposes less than what he makes as a fireman is not determinative of his wage-earning capacity as an electrician. *The test of wage-earning capacity is whether he would earn as much working full time as an electrician as he would working full time as a fireman. He never testified that he could not find employment as an electrician or that he even sought such employment.* Based on the record, I find his proofs [lacking?] by a preponderance that he is disabled under the new definition of disability. [1990 Mich ACO 1311, 1316 (emphasis added).]

Bailey appealed the decision, and the WCAC modified the magistrate's decision. The WCAC noted that the magistrate found as fact that Bailey was partially disabled, but denied him benefits because the injury did not impair his work as an electrician. The WCAC found

that Bailey was impaired in his work as a firefighter and, consequently, that he suffered a limitation of his wage-earning capacity:

> The instant plaintiff has a limitation in the skill of firefighting. The Magistrate found as fact that he has a partial disability in the field of his skill. Firefighting, since at least 1966, and until he was injured at it, was work plaintiff could do, and did. No serious argument can be made that it was not work suitable to his qualifications and training. He now has a limitation in his ability to do that work. The fact that he has no great, or any, limitation in his ability to do electrical contracting has no bearing on the inquiry about *a limitation* in work suitable to his qualifications and training.
>
> Before the injury, plaintiff's wage-earning capacity included, inter alia, electrical contracting and firefighting, both suitable to his qualifications and training. He is now impaired in his ability to fight fires, so he has a limitation in his wage-earning capacity in work suitable to his qualifications and training. Probably because he has more time, he now does more electrical contracting than he was doing in July 1987, and to the extent of the increment, defendant is entitled to credit against compensation ordered. [*Id.* at 1317-1318 (citations omitted; emphasis in original).]

Leoni Township sought leave to appeal and the Court of Appeals denied leave. On December 30, 1992, this Court remanded the case to the Court of Appeals as on leave granted.[4] On remand, the Court of Appeals affirmed in an unpublished per curiam opinion:

> [A]lthough plaintiff was capable of performing other work which fell within his medical restrictions, he was unable to perform the duties of a firefighter. He suffered a limitation in his ability to perform work suitable to his qualifi-

---

[4] 441 Mich 902.

cations and training as a firefighter. Plaintiff is disabled within the meaning of the statutory definition of disability, even though he may be capable of performing other work which falls within his medical restrictions. [Issued May 23, 1995 (Docket No. 160469).]

Leoni Township appealed, and this Court granted leave to appeal.[5]

### I. DEFINITION OF DISABILITY

#### A. THE STATUTORY LANGUAGE

The purpose of the worker's compensation act, MCL 418.101 *et seq.*; MSA 17.237(101) *et seq.*, is to provide benefits to the victims of work-related injuries by placing the cost of making payments of weekly benefits to disabled employees on the employer. *Simkins v General Motors Corp*, 453 Mich 703, 711; 556 NW2d 839 (1996). The employee must prove by competent evidence under MCL 418.301(1); MSA 17.237(301) that he has received a personal injury arising out of and in the course of his employment in order to qualify for benefits. *Id.*[6] As a threshold matter in proving an injury in chapter 3 of the act, MCL 418.301 *et seq.*; MSA 17.237(301)(1) *et seq.*,[7] the employee must demonstrate that the personal injury

---

[5] 451 Mich 897 (1996).

[6] MCL 418.301(1); MSA 17.237(301)(1) provides in part:

> An employee, who receives a personal injury arising out of and in the course of employment by an employer who is subject to this act at the time of the injury, shall be paid compensation as provided in this act.

[7] The worker's compensation act in chapter 4 provides for relief for disabilities arising out of occupational diseases under MCL 418.401; MSA 17.237(401). See *Michales v Morton Salt Co*, 450 Mich 479, 485; 538 NW2d 11 (1995).

is a work-related *disability*. See MCL 418.401(2)(b);
MSA 17.237(401)(2)(b).[8] Chapter 3 of the act specifi-
cally defines "disability":

> As used in this chapter, "disability" means a limitation of
> an employee's wage earning capacity in work suitable to his
> or her qualifications and training resulting from a personal
> injury or work related disease. The establishment of disabil-
> ity does not create a presumption of wage loss. [MCL
> 418.301(4); MSA 17.237(301)(4).][9]

The sentence defining disability separates the defi-
nition of a disability from the concept of wage loss.
Hence, there are two relevant inquiries to determine
if an employee is entitled to worker's compensation
benefits: (1) whether an employee has proven that a
disability exists, and (2) if the employee proves that a

---

[8] This provision defines "personal injury" for the entire worker's com-
pensation act:

> (2) As used in this act:
>
> *          *          *
>
> (b) "Personal injury" shall include a disease or *disability* which
> is due to causes and conditions which are characteristic of and
> peculiar to the business of the employer and which arises out of
> and in the course of the employment. [Emphasis added.]

Although the dissent contends that subsection 301(4)'s meaning is clear
from its plain language, in defining "personal injury" under "this act," the
Legislature has failed to create an unambiguous definition of either term.
By the terms of subsection 401(2)(b), " '[p]ersonal injury' includes . . .
disability." Under subsection 301(4), " 'disability' means a limitation . . .
resulting from a personal injury." Thus, under the plain language of the
act, disability means a limitation resulting from that which includes a disa-
bility; and, personal injury includes that which results from a personal
injury. Reading these provisions together, we cannot conclude that the
plain language alone provides a clear indication of legislative intent.

[9] Chapter 4 of the act, governing injuries that arise from occupational
diseases, provides for an identical definition of disability for that chapter
in MCL 418.401(1); MSA 17.237(401)(1).

disability exists, whether the employee has proven that the disability resulted in a wage loss. Because wage loss is not presumed, an employee who demonstrates that he has suffered a disability must establish that this disability has resulted in a wage loss.

However, in examining the first sentence defining disability, we find that the language is ambiguous because it may reasonably be interpreted to mean either that (1) an employee is disabled only if he suffers a *reduction* in his wage-earning capacity in all the work he could perform within his qualifications and training before the injury,[10] or (2) an employee is disabled if there is at least a single job within his qualifications and training that he can no longer perform because this would be *a* limitation of his wage-earning capacity. Defendants argue that the first interpretation is the proper one, and plaintiffs contend that the second is the proper one.

The definition was added by the Legislature to the worker's compensation act by 1981 PA 200, effective March 31, 1982, and the Legislature then amended the definition in 1987 PA 28. Hence, we briefly examine the state of the law before the 1981 amendment, the change the Legislature created in 1981, and the change it intended in 1987.

---

[10] We use the phrase "a reduction in earning capacity" consistently throughout to refer to a loss in earning capacity when considering the work that the employee could previously perform. This term is not to be confused with residual earning capacity. See part II. Disability is a limitation in earning capacity, and proof of wage loss requires proof of a reduction in earning capacity.

B. REVIEW OF THE 1981 AMENDMENT AND THE 1987 REVISION

1. BEFORE THE AMENDMENT OF 1981

The worker's compensation act was initially enacted in 1912 by the Legislature. See *Sobotka v Chrysler Corp (After Remand)*, 447 Mich 1, 17; 523 NW2d 454 (1994) (BOYLE, J., lead opinion). Before the amendment of 1981, disability was not defined in chapter 3 of the act. The following definition appeared in chapter 4:

> As used in this act:
> (a) "Disability" means the state of being disabled from earning full wages at the work in which the employee was last subject to the conditions resulting in disability.[11]

In 1979, two years before the Legislature amended the act to create a new statutory definition of disability, this Court explained that disability was defined as the " 'inability to perform the work claimant was doing when injured.' " *Powell v Casco Nelmor Corp*, 406 Mich 332, 350; 279 NW2d 769 (1979), quoting 2 Larson, Workmen's Compensation Law, § 57.53, p 10-129, and citing *Allen v Nat'l Twist Drill & Tool Co*, 324 Mich 660, 663; 37 NW2d 664 (1949) (quoting the definition of disability from § 417.1, the precursor of subsection 401[a]).

Before 1981, the Court developed a distinction between skilled and unskilled labor, see *Hutsko v Chrysler Corp*, 381 Mich 99, 103; 158 NW2d 874

---

[11] This provision was amended by 1981 PA 199 as subsection 401(1) to limit the definition to chapter 4 alone, and was replaced by 1985 PA 103, with a new definition that was identical to the parallel provision in subsection 301(4) that had been enacted by 1981 PA 200. Subsection 401(1) was then revised in 1987 in the same way as subsection 301(4) by 1987 PA 28.

(1968),[12] even though the statute did not provide for it. In *Leitz v Labadie Ice Co*, 211 Mich 565, 572; 179 NW 291 (1920), the Court explained the difference between these two kinds of work:

> [W]e think it may safely be said that, as generally used and understood, [common labor] signifies that kind of unskilled manual labor with or without simple tools, which is commonly done by the masses of working people in lines of employment necessitating no special trade or previous training before engaging in them beyond what can be quickly learned and effectually performed by the laborer while employed at regular wage under direction of those in charge; as distinguished from that class of skilled and less common manual labor to perform which previous experience, apprenticeship, study, practice or manual training in some special calling, handicraft or trade is required.

This distinction between skilled and unskilled labor was important for determining whether there was a partial or total disability under this chapter of the act. See Welch, Worker's Compensation in Michigan: Law & Practice (3d ed), § 8.8, p 8-8. Although Michigan case law does not clearly define total and partial disability, see, e.g., 33 Michigan Digest 2d, Workers' Compensation, § 846, pp 119-120, § 856, pp 123-124, through our holdings we established the general rules

---

[12] In *Hutsko*, we noted:

> We readily agree that for several purposes in workmen's compensation cases the difference between skilled and unskilled work has been recognized.

See also *Kaarto v Calumet & Hecla, Inc*, 367 Mich 128, 131-132; 116 NW2d 225 (1962).

governing the meaning of disability in the context of skilled and unskilled labor.[13]

A skilled employee was totally disabled if he was unable to perform his skilled position as a result of his injury, even if he was able to earn wages at another kind of employment. See *MacDonald v Great Lakes Steel Corp*, 268 Mich 591, 593; 256 NW 558 (1934).[14] In contrast, an unskilled employee, or, in other words, an employee working at common labor, was only partially disabled when he was unable to perform his previous job but still able to perform other work "within" his employment of common labor. See *Miller v S Fair & Sons*, 206 Mich 360, 364-366; 171 NW 380 (1919). In order to prove total disability, the unskilled employee had to be unable to perform all the jobs within his employment of common labor. See *Leitz v Labadie Ice Co*, 229 Mich 381, 385-386; 201 NW 485 (1924).[15] Thus, the general rule from case law regarding total and partial disabilities was that an employee is totally disabled if he cannot perform all jobs within his field of employment and is

[13] See Welch, Worker's Compensation (3d ed), *supra*, § 8.6, pp 8-7 to 8-8. See also Leslie, *The tortured course of the definition of disability in Michigan workers' compensation law, past, present and future*, 5 Cooley L R 65, 66-78 (1988).

[14] In *MacDonald, supra* at 593, this Court relied on *Geis v Packard Motor Car Co*, 214 Mich 646, 648-649; 183 NW 916 (1921) (even though the skilled employee could earn wages in similar work, he was still "wholly incapacitated" in his skilled position as a motor tester), and *Jameson v Walter S Newhall Co*, 200 Mich 514, 518; 166 NW 834 (1918) (the skilled employee could rightfully recover for his "total disability" because "the facts here presented conclusively show that the claimant cannot pursue the same kind of employment as he did before the accident, that is, being an *expert* pile driver") (emphasis added).

[15] In *Leitz, supra*, 229 Mich 385-386, this Court affirmed the Worker's Compensation Appellate Board's decision to grant the unskilled employee full recovery for his total disability because it found that he was unable to earn wages in any kind of common labor after his injury.

partially disabled if he can still perform some jobs within his field of employment. See Welch, Worker's Compensation (3d ed), *supra*, § 8.8, p 8-8.[16]

## 2. ENACTMENT OF THE 1981 AMENDMENT

In this context, the Legislature added the provision defining disability, subsection 301(4), to the worker's compensation act in 1981 PA 200, effective March 31, 1982.[17] There have been conflicting indications on the meaning of this amendment.

We determined that the 1981 revisions were designed to modify the expansive interpretations of the act given by this Court. See *Dean v Chrysler Corp*, 434 Mich 655, 666; 455 NW2d 699 (1990). According to the Senate Analysis Section, SB 595, January 7, 1982, p 6, this new provision was designed to "tighten the definition of disability." Moreover, one of the arguments advanced against the new definition was that it "unjustly penalizes disabled workers, giving them no compensation for injuries which seriously diminish their wage-earning ability if they can find any other kind of work." *Id*. The legislative intent underlying the amendment, therefore, suggests that the Legislature meant to create a narrow definition of

---

[16] According to the principles of these rules, a skilled employee generally will not be partially injured: he would be either totally disabled because he was unable to perform his prior skill or he would not be disabled at all because he could perform it. See Welch, Worker's Compensation (3d ed), *supra*, § 8.8, p 8-8.

[17] This provision originally defined disability as follows:

As used in this chapter, "disability" means a limitation of an employee's wage earning capacity in *the employee's general field of employment* resulting from a personal injury or work related disease. The establishment of disability does not create a presumption of wage loss. [Emphasis added.]

disability, which is consistent with the interpretation of the provision urged by defendants.

Conflicting positions have been taken regarding the possible interpretations of the 1981 amendment. In *Dohm v Whirlpool Corp*, 1989 Mich ACO 16, 17, the WCAC expressly rejected the interpretation that an employee must be unable to perform all his work in his field before finding disability. Yet, four years later, in an en banc opinion, the WCAC concluded that the 1981 change was "a dramatic new concept for determining compensable disability" by establishing a new focus on "wage-earning capacity." *Grier v Yellow Freight Systems*, 1993 Mich ACO 2218, 2224. However, the Court of Appeals concluded that the definition from the 1981 amendment was a codification of the definition of disability that this Court developed in its precedent. See *Murdock v Michigan Health Maintenance Organization*, 151 Mich App 578, 583; 391 NW2d 757 (1986).[18]

---

[18] Several experts on Michigan worker's compensation law have drawn a similar conclusion. The chairman of the WCAB in 1982, Michael Gillman, wrote a law review article about the new legislation in which he stated that during the legislative deliberations the "re-definition of disability lost out, and in its place came legislative tinkering with the favored work process." Gillman, *The rise and fall of reasonableness: Favored employment in Michigan workers' compensation*, 1 Cooley L R 177, 206 (1982). Welch identified Gillman as the "author of th[e] language" of the statutory change. See Welch, Worker's Compensation (3d ed), *supra*, § 8.10, p 8-11. Welch also concluded that the new definition was only a codification of prior case law:

The language is so similar to that used in other, older parts of the statute and in the various court decisions over the years that it can be forcefully argued that the legislature merely intended to codify the already existing definition of disability . . . . [*Id.*]

See also Welch, *Workers' compensation at a crossroads: Defining and measuring disability in Michigan*, 73 U of Det Mercy L R 175, 197-203 (1996) (examining the 1981 amendment with the 1987 revision and con-

### 3. ENACTMENT OF THE 1987 AMENDMENT

The statute was amended by 1987 PA 28, which inserted the phrase "work suitable to his or her qualifications and training" in place of "the employee's general field of employment." According to the Senate Fiscal Agency, SB 67, May 26, 1987, p 1, the revision was enacted to narrow the definition of disability:

> Many people believe that the Act's definition of disability ("a limitation of an employee's general field of employment resulting from a personal injury or work related disease") *is too broad* and, thus, allows an individual to remain designated as "disabled" even though the individual could work in another capacity for which he or she was trained and qualified but which was not "in the employee's general field of employment." [Emphasis added.]

In support of the revision, the Senate Fiscal Agency noted that Professor Theodore St. Antoine, who had recommended this change in a 1984 report to Governor James J. Blanchard, indicated that this change would "reassure those who believe that the State's definition of 'disability' is a major flaw in our compensation system." *Id.* at 2.[19]

---

cluding that a worker is disabled if there is any limitation in work suitable to his qualifications and training).

Finally, Professor Theodore St. Antoine in his report Worker's Compensation in Michigan: Costs, Benefits, and Fairness, A report to Governor James J. Blanchard (1984), concluded that the new definition of disability did not create a change in Michigan law:

> But for all the talk about "tightening up" the definition of "disability," I doubt that the new 1981 definition of disability as such will have much impact on the typical compensation case. [*Id.* at 25.]

[19] The Senate Fiscal Agency further stated that the change would send "an important message to the business and manufacturing community that Michigan is serious about reforming its system and reducing employer

This Court examined the meaning of the 1987 revision last term in *Michales v Morton Salt Co*, 450 Mich 479, 485-492; 538 NW2d 11 (1995), in reviewing the parallel definition of disability under subsection 401(1) for occupational diseases. We opined that the revision was designed to narrow the scope of an employee's eligibility for worker's compensation benefits. *Michales, supra* at 490. We explained, by relying on Welch, Worker's Compensation in Michigan: Law & Practice (rev ed), § 8.10, p 8-11 and § 8.11, pp 8-14 to 8-15, that this revision operated to reduce the number of positions in employment that could give rise to a claim of disability by redefining the relevant job pool from the broad category of "field of employment" to the smaller category of "work suitable to [an employee's] qualifications and training." See *Michales, supra* at 490-491, n 17.[20] This understanding of the way in which the Legislature narrowed the definition

---

costs." *Id.* However, Professor St. Antoine had noted that the change "would probably be of small practical consequence." St. Antoine, Worker's Compensation, n 18 *supra* at 27.

[20] In *Michales, supra* at 491, n 17, we quoted from Welch's treatise on Michigan worker's compensation law:

"The 1987 amendments changed the universe of jobs to which a worker's job is compared. Under the old law this was his or her 'field of employment.' Under the new [1987] definition it is 'work suitable to his or her qualifications and training.' For an unskilled worker 'field of employment' meant all unskilled jobs. Now, *however, the worker must show a limitation in the more narrow area of 'work suitable to his or her qualifications and training.'*" [Emphasis added.]

This analysis, of course, does not refer to the fact that this would then increase the number of jobs for which a *skilled* employee could be injured and, therefore, contrary to the Legislature's intent, would expand his opportunity to prove disability. This would apparently eliminate the "absurd" result from *Kaarto*, n 12 *supra* at 131-132, in which a skilled employee would not recover worker's compensation despite his injury because he was still able to perform his skilled job even though he had

is predicated analytically on the interpretation that an employee is disabled whenever he is rendered unable to perform a single job within the category of jobs he is suited to perform, even if the number he continues to be able to perform is numerous and equally well paying.

In contrast, under defendants' interpretation, the 1987 amendment would only operate to narrow the definition of disability if it *increased* the number of available positions as the relevant job pool for determining whether an employee has suffered an injury. In examining whether an employee can still earn money, if there are more positions that the Court can consider, the employee will have a more difficult time proving that he can no longer earn the same wage for those positions. See *Grier, supra* at 2224.[21]

Under either analysis, the Legislature evidenced an intent in its 1987 amendment to eliminate the judicially created distinction between skilled and

___

lost this job because of economic conditions and his earning capacity was reduced as a common laborer.

[21] In *Grier*, the WCAC concluded that the definition of disability was narrowed by *increasing* the number of relevant jobs to consider whether an employee is injured:

[In order to tighten compensability further in 1987] the Legislature *expanded* the field of employment to which the [m]agistrate must look to determine whether a disability is compensable, moving from the claimant's "general field of employment," usually interpreted as meaning the work the claimant was performing at the time of injury, to the broader "work suitable to his or her qualifications and training." Instead of simply looking at the *circumscribed* general field of employment in which the employee worked at the time of injury, the new definition would look at the *wider field of all work suitable to the employee's qualifications and training,* including education, past employment, and work to which plaintiff's abilities could easily be adapted. [*Id.* at 2225 (emphasis added).]

unskilled employment. See Welch, Worker's Compensation (3d ed), § 8.11, p 8-12.[22]

By our reasoning in *Michales*, we suggested that the Legislature intended to provide a definition of disability that is consistent with one urged by plaintiffs. Yet, our understanding of the legislative intent from *Dean* of the 1981 amendment suggests that the narrow interpretation of disability now urged by defendants was the proper one. Although this background of the statute is helpful in explaining the history of our approach to conflicting interpretation, it does not provide a clear answer to the question before us.

### C. THIS COURT'S PREVIOUS INTERPRETATION OF SUBSECTION 301(4)

We recently rejected the interpretation of the provision that we now reconsider in *Rea v Regency Olds/Mazda/Volvo*, 450 Mich 1201; 536 NW2d 542 (1995). In *Rea*, the Court of Appeals had held that "an employee is 'disabled' . . . if the employee suffers from any limitation in wage-earning capacity in work suitable to the employee's qualifications and training." 204 Mich App 516, 523; 517 NW2d 251 (1994).[23] On the basis of this definition, it concluded that the plaintiff was disabled under the statute:

[Plaintiff] has suffered a limitation in his ability to perform work suitable to his qualifications and training, in particular the work he was previously doing for defendant. He

---

[22] "It now seems clear that the same definition of disability applies to both skilled and unskilled workers."

[23] See also *Fraley v General Motors Corp*, 199 Mich App 280, 283-285; 500 NW2d 767 (1993) (in dicta, the Court concluded that an employee was disabled under the 1987 definition because that employee could no longer perform some work within his training and qualifications as a result of his injury).

is disabled even though he may be capable of performing other unskilled work which falls within his medical restrictions. [204 Mich App 524.]

Hence, according to the Court of Appeals, the plaintiff was injured because he was not able to perform a single position suitable to his qualifications and training, i.e., his previous position.

We reversed the Court of Appeals decision in an order by stating:

> *It is not enough for the claimant claiming partial disability to show an inability to return to the same or similar work.* If the claimant's physical limitation does not affect the ability to earn wages in work in which the claimant is qualified and trained, the claimant is not disabled. [450 Mich 1201 (emphasis added).]

In rejecting the Court of Appeals interpretation, we noted that an employee must prove more than the fact that he is unable to perform his previous job or other similar work within his qualifications and training; he must prove that his physical limitation has affected his ability to earn wages in work for which he is qualified and trained.

### D. PROPER INTERPRETATION OF THE DEFINITION OF DISABILITY IN SUBSECTION 301(4)

In reexamining our order in *Rea*, we are now persuaded that the Legislature must have intended, in 1981, to adopt the definition of disability as argued here on appeal by plaintiffs, as the Court of Appeals concluded in *Rea*, for one basic reason. Given the ambiguity in subsection 301(4) and examined in the context of our precedents, the language of the statute

logically sustains this interpretation of the definition of disability.

Subsection 301(4), as previously stated, requires the employee to prove a disability, i.e., that he is eligible for compensation, and then prove wage loss, i.e., that he is entitled to an award. This language codifies the prior approach in Michigan that injury is not compensable without wage loss. If the employee establishes a disability, he must further prove a wage loss because wage loss will not be presumed. See subsection 301(4). However, *in order to prove a wage loss*, under the language of the statute and on the basis of our longstanding interpretation of related precedent, most recently confirmed in *Sobotka*, the employee must establish *a reduction in earning capacity.*[24]

With this conclusion, the definition of disability in subsection 301(4) cannot then be logically interpreted as a reduction of wage-earning capacity as long as wage loss is also measured by a reduction in wage-earning capacity. See *Lawrence v Toys R Us*, 453 Mich 112, 121; 551 NW2d 155 (1996) (LEVIN, J., plurality opinion).[25] Subsection 301(4)'s second sentence

---

[24] The general principle that an employee must prove a reduction in earning capacity in order to establish wage loss must be understood in the context of its practical application of what the employee must prove as explained in part II. Simply stated, although a limitation of wage-earning capacity cannot simply be wage loss, the actual wages lost after the work-related injury or disease represent a reduction in wage-earning capacity if the loss is caused by the work-related injury or disease. We reiterate that reduction in earning capacity is a different concept than residual earning capacity. The Legislature's treatment of favored work in subsection 301(5) is an additional indicator that it had not reached consensus on the question how to deal with a person who was qualified and trained in more than one job. As we have said before, *Sobotka* at 6, we are not inclined to fill in the blanks with our judgment of what the Legislature might have meant.

[25] In *Lawrence*, a plurality of this Court noted that disability and wage-earning capacity were different concepts:

eliminates the possibility that disability and wage loss are defined the same way when it provides that proof of a "disability does not create [a] presumption of wage loss." As a consequence, the Legislature must have instead intended a different meaning for disability. The only other meaning that the ordinary words of the statute may sustain is the definition urged by plaintiffs: an employee is disabled whenever he can no longer perform a job suitable to his qualifications and training as a result of his injury. This conclusion is consistent with our analysis in *Michales*.

Total disability arises from an injury, i.e., "incapacity for work resulting from a personal injury is total" under subsection 351(1), when an employee proves that he is unable to perform all work suitable to his qualifications and training as a result of his injury.[26] A partial disability arises from an injury, i.e., "incapacity for work resulting from a personal injury is partial" under subsection 361(1), when an employee proves that he is unable to perform a single position within his qualifications and training.

## II. THE IMPLICATIONS OF *SOBOTKA*

Because the decision in *Sobotka* has spawned disagreement at the administrative level and at the Court of Appeals, we turn to discussion of the lead opinion

---

"Disability" and "wage earning capacity," as those terms are used in the act, are interrelated but different concepts. A worker is not entitled to benefits unless he is "disabled." "Wage earning capacity," in addition to other possible applications, plays a specific role in determining the amount of benefits in a partial disability case.

[26] By definition, therefore, a totally disabled employee will have no earning capacity at all. See *Irvan v Borman's, Inc*, 412 Mich 496, 503; 315 NW2d 521 (1982) (" 'Totally incapacitated' persons . . . hav[e] no earning capacity").

in that case before applying the general principle that an employee must prove an impairment of wage-earning capacity. We again note that the source of this disagreement may be confusion over the difference between the concepts of "a reduction in wage earning capacity" and "residual wage earning capacity" in the context of a worker claiming partial disability. In *Sobotka*, an employee was found to be partially disabled from a 1978 injury,[27] and claimed that this personal injury had totally prevented him from earning a wage under subsection 361(1).[28] The following portion of the defendant's brief accurately summarized the questions presented in *Sobotka*:

The difference between MTLA's/plaintiff's "fall-back" position, on the one hand, and defendant's position, on the other, can be illustrated as follows. Plaintiff and MTLA would have the factfinder ask itself two questions in cases like this:

(1) Does the employee have some degree of disability?

(2) If so, has the employee earned any wages after the commencement of that disability?

If the factfinder's answer to these questions is that the employee is disabled *to any degree* and no wages have actually been earned after the commencement of the disability, then the employee is to be automatically awarded the maximum rate of compensation. [Emphasis added.]

Defendant's position is that if the employee is partially disabled and if no wages have actually been earned thereafter, then the factfinder must ask:

[27] In *Sobotka, supra* at 17, the WCAB had determined that the plaintiff was partially disabled and that finding was not challenged. The issue was what this disability warranted in compensation.

[28] The injury in *Sobotka* arose before the Legislature revised the act in 1981. The Court in *Sobotka* reserved judgment on the question whether the amendments would affect its analysis of the act. *Id.* at 20, n 18 (BOYLE, J., lead opinion).

(3) *Why* has the employee earned no wages since the commencement of the disability? [Emphasis in the original.]

If the answer to the question is that the employee has earned no wages because of the work injury, then the employee should receive the maximum rate of compensation to which he or she is entitled. On the other hand, if the answer to the question is that a partially disabled employee is not earning wages within his or her residual capacity for reasons other than the work injury, then the employee does not necessarily receive the maximum rate of compensation. Instead, he or she receives the rate commensurate with the diminution in wage-earning capacity that *is* the result of the work injury. [See also *Sobotka* at 18-19.]

We held that § 361 did not require that plaintiff's award be reduced by the amount he is hypothetically able to earn after the injury.

We also addressed what appeared to us to be a straightforward question: Could benefits ever be denied where plaintiff was injured and unemployed? We answered: "Yes," where the defendant carries the burden of showing the plaintiff's "employability." *Fellows v Fuller Brush Co*, 1996 Mich ACO 151, 161.[29] Our response was intended simply (1) to reject the plaintiff's claim that the mere fact that a claimant remained unemployed after injury automatically established an absence of wage-earning capacity under § 361,[30] (2) to accept the claim that if the employee has earned no wages because of the work injury, he should receive the maximum benefits to

---

[29] Professor Welch was correct in surmising, that in responding to the parties' submissions in *Sobotka*, "the court was never informed of all of the implications of its decision . . . ." Welch, n 18 *supra* at 194, n 108.

[30] Justice LEVIN's opinion appeared to recognize agreement with the lead opinion's proposition that where lack of employment is *not* attributable to the work-related injury, benefits are not awardable. See *Sobotka* at 34, n 3 (LEVIN, J., separate opinion).

which he is entitled, and (3) to reject the claim that a partially disabled employee who is not earning wages receives the rate of benefits "that is commensurate with the diminution in wage-earning capacity that is the result of the work injury."

Thus, although we agreed with the defendant that absence of wages not truly related to the work injury did not justify an award of compensation and held that a magistrate could infer that a plaintiff is avoiding work, *Sobotka* at 27, we rejected the defendant's claim that a partially disabled worker who is not receiving wages must prove that the absence of wages is due to absence of residual wage-earning capacity. *Id.* The lead opinion in *Sobotka* was therefore not intended to resurrect the approach that benefits must be calculated and reduced on the basis of residual earning capacity and furnishes no authority for the proposition that subsection 301(5)(b) requires employees to prove loss of residual earning capacity.[31] Unemployment or reduced wages must be causally linked to work-related injury, and a plaintiff may not

---

[31] The lead opinion specifically noted that there was no legislative definition of disability under chapter 3 of the act in effect at the time of plaintiff *Sobotka*'s injury. *Id.* at 20, n 18. Thus, the holding in terms applied only to injuries before 1981. The question of a new wage-earning capacity under subsection 301(5) is not directly presented in these cases. However, subsection 301(5)(e) provides that a plaintiff who works postinjury for less than one hundred weeks and "loses his or her job for whatever reason" need not litigate the issue of a new wage-earning capacity. "[T]he employee shall receive compensation based upon his or her wage at the original date of injury." It has been observed "that the 1981 Legislature was aware of the appeal board's [and Court of Appeals] practice of not inquiring into *residual* wage-earning capacity when the employee does not work postinjury, agreed that this was a wise rule, and consequently decided to *extend* the *same* rule to workers whose postinjury employments are under 100 weeks." Braden, *Reduction of workers' compensation wage loss benefits by residual earning capacity*, 74 Mich B J 922, 926 (1995) (emphasis added).

reject actual wages reasonably offered or avoid or refuse actual wages.[32]

While the lead opinion rejected the interpretation that "able to earn" in subsection 361(1) is only synonymous with actual wages earned or refused, see *Sobotka, supra* at 19, 21-22 (BOYLE, J., lead opinion), relying in part on *Pulley v Detroit Engineering & Machine Co*, 378 Mich 418, 423, 428; 145 NW2d 40 (1966), and *Hood v Wyandotte Oil & Fat Co*, 272 Mich 190, 192-193; 261 NW 295 (1935)[33] we quoted with approval this Court's previous conclusion that the " 'real inquiry [for determining loss of wages] relates to the monetary worth of the injured workman's services in the open labor market under normal employment conditions.' " *Sobotka, supra* at 24-25 (BOYLE, J., lead opinion), quoting *Jones v Cutler Oil Co*, 356 Mich 487, 490; 97 NW2d 74 (1959). However, we did not intend to imply that *residual* wage-earning capacity was relevant to proof of wage loss. Rather, we intended our analysis to reflect the fact that the magistrate's role in judging the credibility of the

---

[32] We were not presented in *Sobotka* with Justice BRICKLEY's hypothesis of a situation in which a partial injury precludes employment to a certain degree. However, while it is one thing to state the logical proposition that if an absence of wages may be wholly due to injury or not at all due to injury, "absence of wages may be only partially attributable to disability," *Sobotka* at 54, it is quite another to say that the statute requires the loss of residual wage-earning capacity to be used as a measure for the extent of disability and the amount of benefits in the absence of postinjury employment.

[33] In *Sobotka, supra* at 22, we quoted this Court's analysis in *Hood, supra* at 192:

"What is meant by the term 'wage-earning capacity after the injury?' *It is not limited to wages actually earned after injury, for such a holding would encourage malingering and compensation is not a pension.*" [Emphasis added.]

employee's evidence is central to determining whether he is entitled to an award.[34]

Although we rejected the plaintiff's claim that wage loss from any source and a personal injury automatically mandated maximum benefits, we held, as the Court of Appeals correctly concluded in *Brown v Contech, Div of Sealed Power Technologies*, 211 Mich App 256, 262; 535 NW2d 195 (1995), that where unemployment of a partially disabled employee is found to be directly attributable to a compensable injury, maximum benefits may be awarded.[35] We observed:

> Where, on account of an injury, an employee is, in fact, unemployed, the employee is entitled to the maximum benefit allowable under § 361(1), because the employee is not "able to earn" wages postinjury. [*Sobotka* at 7-8.]

---

[34] As we noted in *McKissack v Comprehensive Health Services of Detroit*, 447 Mich 57, 70-71; 523 NW2d 444 (1994):

> The lead and concurring opinions [in *Sobotka*] held that *Trask* [*v Modern Pattern & Machine Co*, 222 Mich 692; 193 NW 830 (1923)] and any progeny have been superseded by subsequent legislation insofar as they allowed consideration of general changes in economic conditions as a factor "to be used to determine the proportionate extent of an impairment of earning capacity . . . . *Sobotka* holds that *an employer is not entitled to a determination of a residual wage-earning capacity* and that the absence of wages and evidence of a work-related injury permits an award of maximum benefits. The factfinder is free to accept or reject evidence of actual wages earned, avoided, or refused, or other factors affecting an employee's actual as opposed to theoretical employability. [Emphasis added.]

[35] We note that our holding in part I expressly rejects the position adopted by the WCAC majority in *Brown v Contech, Div of Sealed Power Technologies*, 1992 Mich ACO 2494, 2495, that the plaintiff must "prove . . . that the injury precludes the performance of work suitable to his or her qualifications and training [and that] [t]he relevant inquiry to be made is whether the plaintiff has the ability to work at any other type of job by virtue of his or her qualifications and training."

Most importantly, we rejected the principle that the employer of a partially disabled employee should be credited with a wage-earning capacity in the absence of postinjury employment. As we specifically stated, this means that it is not part of the plaintiff's burden in proving disability that other factors are not the cause of his unemployment. Plaintiff need not prove what he is theoretically "able to earn" after the injury, that other factors are not the cause of his unemployment, or that the amount of residual capacity is diminished.[36] If the magistrate credits testimony that there is a direct link between wages lost and a work-related injury, plaintiff need not prove anything in addition.[37] By the language and structure of the statute and previous interpretation of the Court, an employee must prove a reduction in earning capacity. However, *Sobotka* furnishes no authority for the proposition that plaintiffs must prove absence of residual earning capacity, i.e., an inability to earn the same wages when considering *all* the jobs within his qualifications and training.

Further, except as otherwise indicated, subsection 301(5) does not require an *adjustment* of benefits on the basis of existence of a residual wage-earning

---

[36] Thus, we reject the position of the WCAC majority in *Brown*, n 35 *supra* at 2496, that benefits are not awardable because a plaintiff who retains " 'considerable residual ability' [is] therefore not disabled," and we reject the position taken by the WCAC in *Braddock v Bellrose, Inc*, 1994 Mich ACO 2319, that the factfinder may *reduce* benefits where the evidence "show[s] that other factors caused the worker's post-injury unemployment . . . ." See Welch, n 18 *supra* at 188-189, n 83.

[37] The plaintiff's contention that maximum benefits were mandated even though no job had been offered because § 361 awards the difference between what plaintiff is "able to earn" (zero, where work is not offered) after the injury and what he earned before was rejected simply because such an argument fails to acknowledge the magistrate's authority to resolve the credibility question.

capacity. Whether disability is total or partial, actual loss of wages causally linked to a work-related injury is loss of wage-earning capacity.[38]

In summary, absent clear legislative direction to the contrary,[39] we conclude that for an employee to carry his burden of proving an impairment of wage-earning capacity, he must prove (1) a work-related injury, (2) subsequent loss in actual wages, and (3) that the injury caused the subsequent wage loss. Where the employee has carried his burden of proving wage loss, he will, as a practical matter, have proven that he is unable to perform a single job within his qualifications and training, and, therefore, that he is disabled.

---

[38] An employer may refute the causal connection between the partial disability and the employee's unemployment with evidence that other factors are the cause of the unemployment, e.g., an employee's ailments that are unrelated to his previous employment or malingering. *Id.* at 22, and 26, n 26 (BOYLE, J., lead opinion) (relying on 1C Larson, Workmen's Compensation, § 57.12[e], p 10-56), 53 (BRICKLEY, J., dissenting). However, where the employer chooses to produce evidence regarding the availability of specific employment, such evidence is admissible solely to refute the causal connection.

Where the plaintiff is unemployed and the magistrate credits a link between disability and actual lost wages, evidence of residual earning capacity is not probative of any material issue.

The result under subsection 301(5)(a), when an employee refuses a reasonable offer of work, is to deny benefits. Cf. Gillman, *The rise and fall of reasonableness: Favored employment in Michigan workers' compensation,* 1 Cooley L R 177, 208 (1982) (citing case law before the enactment of subsection 301[5][a] reducing benefits where an employee refused favored work within his capacity).

[39] The dissent advances a construction of the statute that the Legislature "perhaps" intended. *Post* at 668. Given that concession, there cannot be a confident conclusion that the language of subsection 301(4) evidences legislative intent consistent with the dissent's conclusion.

### III. APPLICATION

#### A. STANDARD OF REVIEW

In reviewing a decision by the WCAC, in the absence of fraud, this Court accepts the factual determinations of the commission as conclusive under MCL 418.861a(14); MSA 17.237(861a)(14) if the commission acts within its powers. *Goff v Bil-Mar Foods, Inc (After Remand)*, 454 Mich 507, 513; 563 NW2d 214 (1997). However, as we noted earlier, we review questions of law from the WCAC's final orders. *Id.* at 512, citing subsection 861a(14). The WCAC, in reviewing a decision by the magistrate, determines whether the referee's decision was supported by competent, material, and substantial evidence on the whole record under subsection 861a(3). *Id.* at 513-514.

#### B. *HASKE*

In *Haske*, the WCAC found that the employee was still able to perform work within his qualifications and training and, therefore, did not suffer a "loss" in wage-earning capacity. Thus, the WCAC determined that Haske was not disabled, using an erroneous definition of disability. There is no dispute that he was unable to perform his previous position, but there were other positions he could perform, and, thereby, Haske established a partial disability. However, the WCAC found that he was not disabled because he suffered no loss in earning capacity, i.e., what he "is able to earn" after the personal injury, relying on plaintiff Haske's capacity to earn some wages within his qualifications and training. The proper standard for determining whether plaintiff Haske has proven a loss in wages caused by his disability is explained in part II of this opinion. In proving wage loss, plaintiff Haske

must establish to the factfinder's satisfaction (1) a work-related injury, which he has done in proving a partial disability, (2) an actual loss in wages, and (3) that the injury caused the loss in wages. Because the magistrate applied the correct legal standard and found the causal link between plaintiff's injury and his postinjury loss in wages, we affirm the Court of Appeals decision to remand the case to the WCAC for further proceedings to determine if there was competent, substantial, and material evidence to support the magistrate's decision.

### C. *BAILEY*

In *Bailey*, the WCAC incorrectly concluded that the magistrate found as a fact that the employee had suffered a partial disability and then reversed the magistrate's denial of benefits because the WCAC determined that the employee had suffered a limitation in his earning capacity because he can no longer work as a firefighter. Contrary to the conclusion of the WCAC, the magistrate made no finding of fact that Bailey was disabled. There being no factual finding of disability by the magistrate, the WCAC applied the correct legal definition of disability, but erred in awarding benefits. Consequently, we remand this case to the magistrate for a determination regarding whether Bailey has factually proven disability and for further proceedings pursuant to the standards articulated in this opinion.[40]

---

[40] Because the record in *Bailey* is not sufficient for the purposes of review, we remand the case to the magistrate, instead of to the WCAC, in order to allow the magistrate an opportunity to establish a complete record for purposes of review by the WCAC. See MCL 418.861a(12); MSA 17.237(861a)(12) (providing the WCAC the power to remand a matter to the magistrate if the record is insufficient for purposes of review).

CONCLUSION

We hold that an employee proves a disability where he proves he can no longer perform a job suitable to his qualifications and training as a result of his injury. An employee's disability is compensable only where he proves wage loss by showing a reduction in earning capacity. An employee establishes a reduction in earning capacity where he establishes to the factfinder's satisfaction that a reduction or elimination of his wages, subsequent to the work-related injury, is causally linked to the work-related injury.

In *Haske*, we affirm the Court of Appeals decision to remand the case to the WCAC, and we direct the WCAC to apply the statute's definition of disability and wage loss in light of this Court's opinion. In *Bailey*, we remand this issue to the magistrate for further proceedings consistent with the standards defined in this opinion.

MALLETT, C.J., and CAVANAGH and KELLY, JJ., concurred with BOYLE, J.

WEAVER, J. (*concurring in part and dissenting in part*). I write separately because the majority has lowered the threshold determination of disability under subsection 301(4) of Michigan's Worker's Compensation Act, despite the Legislature's attempts to raise that threshold in 1981 and 1987.[1] The majority

---

[1] This Court has found that both the 1981 and 1987 amendments were intended to make disability more difficult to prove. See, e.g., *Dean v Chrysler Corp*, 434 Mich 655, 666; 455 NW2d 699 (1990), *Michales v Morton Salt Co*, 450 Mich 479, 490; 538 NW2d 11 (1995). As stated in *Dean*, "Although the dollar amount of benefits payable to workers eligible for compensation was increased, there can be no doubt that the Legislature . . . intended through its 1980 and 1981 reform efforts to narrow and restrict the eligibility qualifications." *Id.*, pp 666-667.

holding effectively returns disability analysis to its pre-1981 and 1987 state.[2] Further, the majority's three-part test to establish a "compensable disability" fails to account for over forty years of wage-loss analysis. Thus, I dissent from the majority's analysis of subsection 301(4) and wage loss.

I

Subsection 301(4) as amended in 1987 states:

> As used in this chapter, "disability" means a limitation of an employee's wage earning capacity in work suitable to his or her qualifications and training resulting from a personal injury or work related disease. The establishment of disability does not create a presumption of wage loss.

The plain language of subsection 301(4) defining disability in the worker's compensation act is composed of two inquiries: first, whether there is a work-related injury or disease, and, second, whether that work-related injury or disease resulted in "a limitation of an employee's wage earning capacity in work suitable to his or her qualifications." I believe that the employee has the burden of proof with respect to both inquiries.[3]

---

[2] The majority holding that "an employee is disabled if there is at least a single job within his qualifications and training that he can no longer perform," *ante*, p 643, is in effect indistinguishable from pre-1981 cases such as *Powell v Casco Nelmor Corp*, 406 Mich 332, 350; 279 NW2d 769 (1979) (holding that disability is the inability to perform work the claimant was doing when injured), and *Pigue v General Motors Corp*, 317 Mich 311, 315; 26 NW2d 900 (1947) (finding total disability where an employee was unable to do the same work after the injury).

[3] The person seeking worker's compensation benefits has traditionally carried the burden of establishing eligibility by proving a disability. See, e.g., *Draper v Regents of Univ of Michigan*, 195 Mich 449, 456; 161 NW 956 (1917), and *Bachula v General Motors Corp*, 191 Mich App 193, 194; 477 NW2d 486 (1991).

My approach to subsection 301(4) is criticized as ignoring the import of the second sentence of subsection 301(4). As will be addressed in part IV, I believe that the second sentence states the basic premise that Michigan's worker's compensation system is a wage-loss system. Wage loss establishes *entitlement* to benefits. However, the question of wage loss is reached only after the threshold question of *eligibility* for benefits under subsection 301(4) has been proven.

The first inquiry under subsection 301(4), the existence of a work-related injury or disease, is typically a straightforward one. In these cases there is no dispute regarding the existence of work-related injuries. However, the Court has struggled to articulate the nature and scope of the plaintiff's burden regarding the second inquiry. Thus, the focus of this opinion is on interpreting "a limitation of an employee's wage earning capacity in work suitable to his or her qualifications."

II

A "limitation" is defined as "some factor in [a person's] makeup which restricts the scope of a person's activity or accomplishment." *Webster's New World Dictionary* (3d ed). While a limitation may be purely physical, it would be inconsistent with the plain language of subsection 301(4) to conclude that the Legislature intended "a limitation" to mean nothing more than a physical limitation because the words "a limitation" cannot be considered separately from their restrictive clauses "of an employee's wage earning capacity in work suitable to his or her qualifications and training." To prove that a disability exists, the statute requires proof of both a work-related injury or

disease and "a limitation of an employee's wage earning capacity in work suitable to his or her qualifications and training." Thus, the employee must prove more than the work-related disease or injury.

I believe that the most basic interpretation of "wage earning capacity" is that it describes an employee's ability to earn wages. Perhaps because an employee is theoretically able to earn wages in a great variety of ways, the Legislature restricted consideration to "work suitable to [an employee's] qualifications and training." Where an employee is qualified and trained in more than one job, then his wage-earning capacity includes consideration of all those jobs under the plain meaning of subsection 301(4). Whether "a limitation" exists in an individual's "wage earning capacity" where that individual is qualified and trained in more than one job therefore requires consideration of the effect of the work-related disease or injury on earning capacity in *all those jobs* in which the individual is qualified and trained.[4] The statute does not state or imply that inability to perform one job within the individual's qualifications and training necessarily results in "a limitation [in] wage earning capacity." Thus, I cannot agree with the majority's conclusion that "an employee is disabled if there is at least a single job within his qualifications and training that he can no longer perform." *Ante*, p 643. I believe the majority's conclusion fails to consider whether the overall wage-earning capacity of the individual was actually limited and, therefore, is not true to the plain language of subsection 301(4).

---

[4] The scope of this inquiry, practically, should be limited to that qualification and training that is current to the employee.

"[I]n work suitable to his or her qualifications and training" is a restrictive clause that modifies "a limitation [in] wage earning capacity."[5] What work is suitable will obviously depend on the qualifications and training of the employee in each case. The reference to an employee's qualifications and training restricts the types of employment that can be considered to determine wage-earning capacity. Thus, it would be inconsistent with the language of the clause to find that an injured electrician's wage-earning capacity included menial labor or unskilled labor.[6] Nor would it be consistent to assume that the electrician could maintain his wage-earning capacity by adopting a new career requiring some additional training.

Evidently relying entirely on a footnote in *Michales v Morton Salt Co*, 450 Mich 479, 490-491, n 17; 538 NW2d 11 (1995), the majority concludes that *Michales* held that "an employee is disabled whenever he is rendered unable to perform a single job within the category of jobs he is suited to perform, even if the number he continues to be able to perform is numerous and equally well paying," and therefore, that *Michales* is consistent with the plaintiff's theory of disability. *Ante*, p 651. This strained reinterpretation of *Michales* deserves rebuttal.

In *Michales*, the Court noted "a person is not compensably disabled within the meaning of the current definition if the employee remains able to perform the work suitable to the employee's qualifications and

---

[5] By 1987 PA 28 the language "work suitable to his or her qualifications and training" replaced "the employee's general field of employment."

[6] However, if an employee is disabled, such subsequent employment would likely affect his wage loss, thereby reducing the benefits to which he is entitled.

training without limitation of wage-earning capacity."
*Id.*, pp 493-494. There is no evidence that the Court
based its conclusion that the plaintiff was not dis-
abled solely on the fact that he remained able to per-
form the same duties after the injury as before. The
*Michales* analysis repeatedly emphasized that the
plaintiff had not proven a limitation in wage-earning
capacity in work suitable to his qualifications and
training. *Michales* noted:

> The relevant inquiry is not whether there is a theoretical
> job in the employee's general field of employment that the
> employee is no longer able to perform. Instead, the question
> is whether the employee's wage-earning capacity, i.e., ability
> to earn wages, has been limited, considering the employee's
> qualifications and training. [*Id.*, p 493, n 19.]

As Justice CAVANAGH succinctly stated in his *Michales*
concurrence:

> Although [the plaintiff] established a personal injury, he
> completely failed to introduce any evidence of a limitation
> in his wage-earning capacity. As required by MCL
> 418.401(1); MSA 17.237(401)(1), both an injury and a limi-
> tation in wage-earning capacity must be shown. A complete
> failure to introduce any evidence of a limitation in wage-
> earning capacity resulting from the injury simply precludes
> an award of benefits as a matter of law. [*Id.*, p 496.][7]

While it is true that the plaintiff in *Michales* was able
to perform the same job before and after the injury,
this particular circumstance does not justify the

---

[7] Subsection 401(1) at issue in *Michales* is part of Chapter 4 of the
worker's compensation act addressing occupational diseases. It is func-
tionally equivalent to subsection 301(4).

majority's dramatic move away from the language of subsection 301(4).

III

Applying my interpretation of subsection 301(4) to the cases presented suggests the following conclusions.[8]

In *Bailey*, the plaintiff was qualified and trained as a firefighter and an electrical contractor at the time of the injury. I believe that in order to prove disability under the act, Bailey needs to prove that his firefighting injury caused "a limitation [in] wage earning capacity" as both a firefighter and an electrical contractor. A limitation in wage-earning capacity is not simply presumed because he can no longer fight fires; rather, he must show that he has a limitation in his combined wage-earning capacity as a firefighter and an electrical contractor. In other words, I would require plaintiff to prove his inability, resulting from his firefighting-related injury, to earn as much as an electrical contractor as he earned doing both jobs at the time he was injured. Thus, I would find that Bailey has not proven a disability. However, I agree that it is appropriate to remand this case to the magistrate. See n 8. I would instruct the magistrate to make an additional record regarding Bailey's wage-earning capacity as an electrical contractor to determine whether the loss of the firefighting income caused a limitation in wage-earning capacity and thus a disability *eligible* for benefits under subsection 301(4).

---

[8] Although I would find that neither plaintiff has carried the burden of proof regarding disability because each has failed to show "a limitation of wage earning capacity," it is appropriate and fair to remand these cases in light of the difficult language of 301(4).

In *Haske*, the plaintiff was qualified and trained as a truck driver. After his work-related injury, he eventually continued to work as a truck driver. However, physical restrictions resulting from his work-related injury may have affected his wage-earning capacity as a truck driver. It is unclear whether he was able to earn as much as he earned after the injury with the injury-related restriction as he earned before. Therefore, in order to be found disabled and eligible for benefits, Haske must demonstrate that his wage-earning capacity as a truck driver was limited as a result of the work-related injury. Thus, I dissent from the majority conclusion that Haske is partially disabled on the proofs presented, but I concur with the majority that the case should be remanded to the WCAC. However, I would ask the WCAC to make additional findings of fact from the record regarding Haske's wage-earning capacity as a truck driver after the injury in order to determine whether Haske is eligible for benefits under subsection 301(4). If the record is insufficient regarding this necessary information, it would be appropriate to remand to the magistrate to make an additional record regarding Haske's wage-earning capacity.

IV

I agree with the concurrence/dissent of Justice RILEY that wage loss is the basic operative criterion for determining entitlement to compensation benefits. *Post*, pp 679-680. However, this fundamental understanding of Michigan's wage-loss system does not logically support the concurrence/dissent's conclusion that "subsection 301(4) must define a disability as an inability to perform at least a single job within an

employee's qualifications and training." *Id.*, p 680. The concurrence/dissent's misinterpretation of disability appears to arise from the second sentence of subsection 301(4) that states, "[t]he establishment of disability does not create a presumption of wage loss." I believe the concurrence/dissent misconstrues the purpose of the second sentence and the effect of my approach to disability. As will be shown below, and contrary to the concurrence/dissent's assertion that my approach to subsection 301(4) will render the second sentence unnecessary,[9] requiring proof of "a limitation of wage earning capacity in work suitable to [an employee's] qualifications and training" to establish eligibility for benefits is not inconsistent with the concept and calculation of wage loss.

The majority similarly misconstrues the second sentence of subsection 301(4) where it states:

> [T]he definition of disability in subsection 301(4) cannot then be logically interpreted as a reduction of wage-earning capacity as long as wage loss is also measured by a reduction in wage-earning capacity. . . . Subsection 301(4)'s second sentence eliminates the possibility that disability and wage loss are defined the same way . . . . [*Ante*, pp 654-655.]

However, the majority goes further by compressing the questions of disability and wage loss into a combined three-step analysis made entirely out of whole cloth. *Id.*, pp 634 and 662. This three-step test effectively transforms wage loss into mere consideration of actual wages lost. The majority's three-part test to establish a "compensable disability" fails to account

---

[9] *Post*, p 681, n 5.

for over forty years of wage-loss analysis that this Court has consistently interpreted to mean more than simply actual wages lost. Wage loss requires consideration of *loss of earning capacity. Sobotka v Chrysler Corp (After Remand),* 447 Mich 1, 24-25; 523 NW2d 454 (1994); *Leizerman v First Flight Freight Service,* 424 Mich 463; 381 NW2d 386 (1985); *Kidd v General Motors Corp,* 414 Mich 578, 591-592; 327 NW2d 265 (1982); *Pigue v General Motors Corp,* 317 Mich 311, 316; 26 NW2d 900 (1947). Further, it is unclear what effect the three-part test has on the majority holding that a disability is a work-related injury or disease plus the inability to perform a single job.

The second sentence of subsection 301(4), "[t]he establishment of disability does not create a presumption of wage loss," underscores the basic premise that Michigan's worker's compensation system is, and has always been, a wage-loss system. *Sobotka, supra* at 6 (BOYLE, J., lead opinion). Under the wage-loss approach, an employee may prove a disability under subsection 301(4) and thus be *eligible* for benefits and yet not be *entitled* to benefits because of other factors.

The concept of wage loss is reflected by provisions of the worker's compensation act such as subsection 301(5)(a), which disqualifies an eligible, disabled employee if the employee has refused favored work, and subsection 301(5)(c), which disqualifies an eligible, disabled employee who earns as much or more after the injury as before, for the duration of such earning. Thus, where an employee effectively removes himself from the workforce by refusing favored work or where he earns more than before the injury, the employee is not entitled to benefits

because he has effectively suffered no wage loss. The wage-loss approach is further demonstrated by provisions that adjust the benefits of an eligible employee to reflect the employee's actual earning after the injury. Subsections 301(5)(b), (d), and (e).

However, wage loss requires more than consideration of actual wages lost; it requires consideration of loss of earning capacity. *Sobotka, supra* at 24-25; *Leizerman, supra*. This general principle for wage-loss calculation is stated in subsection 371(1).[10] The actual amount of wage-loss benefits to which an employee is entitled, once eligibility is proven, is determined under subsections 351(1)[11] or 361(1).[12]

---

[10] Subsection 371(1) provides:

The weekly loss in wages referred to in this act shall consist of the percentage of the average weekly earnings of the injured employee computed according to this section as fairly represents the proportionate extent of the impairment of the employee's earning capacity in the employments covered by this act in which the employee was working at the time of the personal injury. The weekly loss in wages shall be fixed as of the time of the personal injury, and determined considering the nature and extent of the personal injury. The compensation payable, when added to the employee's wage earning capacity after the personal injury in the same or other employments, shall not exceed the employee's average weekly earnings at the time of the injury.

[11] Subsection 351(1) provides in part:

While the incapacity for work resulting from a personal injury is total, the employer shall pay, or cause to be paid as provided in this section, to the injured employee a weekly compensation of 80% of the employee's after-tax average weekly wage, but not more than the maximum weekly rate of compensation, as determined under section 355. Compensation shall be paid for the duration of the disability.

[12] Subsection 361(1) provides:

While the incapacity for work resulting from a personal injury is partial, the employer shall pay, or cause to be paid to the injured employee weekly compensation equal to 80% of the difference

The majority and the concurrence/dissent of Justice RILEY lower the threshold regarding disability (eligibility for benefits) because the language of subsection 371(1) includes consideration of "the proportionate extent of the impairment of the employee's earning capacity . . . ." Presumably the reasoning relates to the substance of the second sentence of subsection 301(4).

It is my conclusion that the second sentence of subsection 301(4) means that an injury resulting in "a limitation of an employee's wage earning capacity" will not always result in a wage loss or entitlement to benefits. I do not believe that my approach to disability violates the mandate of subsection 301(4) that "[t]he establishment of disability does not create a presumption of wage loss." There may be some redundancy of proof required for "a limitation of an employee's wage earning capacity" under subsection 301(4) and "the proportionate extent of the impairment of the employee's earning capacity" under subsection 371(1); however, the two provisions are not identical in meaning. Subsection 301(4) arguably encompasses a wider range of potential employments than subsection 371(1), because subsection 371(1) expressly limits the wage-earning calculation to those employments that the employee was actually working at the time of the injury. There may well be a situation in which an employee's current qualifications and

---

between the injured employee's after-tax average weekly wage before the personal injury and the after-tax average weekly wage which the injured employee is able to earn after the personal injury, but not more than the maximum weekly rate of compensation, as determined under section 355. Compensation shall be paid for the duration of the disability.

training include work or employments that he was not actually doing at the time of the injury. If the magistrate so finds, and finds also that the employee's earning capacity at work is equal to what he was earning at the time of the injury, then the employee would not be disabled and therefore not eligible for benefits. The question of entitlement to wage-loss benefits would simply not be reached.

While it is perhaps a rare set of facts that there would be found "a limitation of an employee's wage-earning capacity" and yet no wage loss, I prefer to follow the plain language of the statute.

For these reasons, I concur that these cases should be remanded; however, I would offer different instructions on remand. I dissent from the majority's reasoning and its conclusion that Haske has proven that he is eligible for benefits under subsection 301(4). I would also find that Bailey has not proven a disability under subsection 301(4) on the proofs presented.

BRICKLEY, J., concurred with WEAVER, J.

RILEY, J. (*concurring in part and dissenting in part*). I agree with the majority opinion's analysis in part I insofar as it holds that in order to establish a disability under MCL 418.301(4);  MSA 17.237(301)(4) an employee need only prove that (1) he has suffered a personal injury or work-related disease and (2) that he is no longer able to perform any work, even a single job, within his qualifications and training. Moreover, I agree that the employee must, as an independent second step, prove wage loss by demonstrating a reduction in earning capacity to establish his right to recovery. See *ante* at 634. In my opinion, this is the

meaning of a *compensable* disability under subsection 301(4). However, I do not agree with the three-part test the majority has identified from *Sobotka v Chrysler Corp (After Remand)*, 447 Mich 1, 17; 523 NW2d 454 (1994), in part II, that operates to displace completely the two-step analysis envisioned by the Legislature and that wrongly lowers the threshold of proof necessary to demonstrate a loss of earning capacity.

In applying the proper standard, I concur in the majority's holding in *Haske v Transport Leasing, Inc,* that plaintiff Andrew Haske was partially disabled and in the decision to remand to the WCAC. Hence, I would also affirm the decision of the Court of Appeals. In *Bailey v Leoni Twp,* however, I dissent from the majority's decision to remand to the magistrate. I would reverse the decisions of the Court of Appeals and the Worker's Compensation Appellate Commission and reinstate the magistrate's denial of benefits.

### ANALYSIS

#### I. PROOF OF A COMPENSABLE DISABILITY UNDER SUBSECTION 301(4)

In order to become eligible to receive worker's compensation benefits under chapter 3 of the Worker's Disability Compensation Act, MCL 418.301; MSA 17.237(301), the employee must prove that he has suffered a personal injury arising out of and in the course of his employment. See MCL 418.301(1); MSA 17.237(301)(1).[1] In order to meet this test, the

---

[1] MCL 418.301(1); MSA 17.237(301)(1) provides in part:

employee must prove that his personal injury was a "disability" under subsection 301(4):

> As used in this chapter, "disability" means a limitation of an employee's wage earning capacity in work suitable to his or her qualifications and training resulting from a personal injury or work related disease. The establishment of disability does not create a presumption of wage loss.

Like the majority, see *ante* at 642-643, I believe that subsection 301(4) is composed of two proofs: the employee must (1) prove that he has suffered a disability and (2) prove that this disability has resulted in a subsequent wage loss. In other words, the employee must first prove disability and then must prove that it is compensable. See *Rea v Regency Olds/Mazda/Volvo*, 450 Mich 1201, 1202; 536 NW2d 542 (1995) (RILEY, J., dissenting) ("To be a *compensable disability* under the act, it is necessary to show both the work-related injury *and* wage loss") (emphasis in original). Moreover, the Legislature has provided that the calculation of wage loss is measured by an "impairment [in] earning capacity" in the employments in which the employee was working when the injury occurred. MCL 418.371(1); MSA 17.237(371)(1).[2] This Court has reiterated the point on

---

An employee, who receives a personal injury arising out of and in the course of employment by an employer who is subject to this act at the time of the injury, shall be paid compensation as provided in this act.

[2] Subsection 371(1) provides in full:

The weekly loss in wages referred to in this act shall consist of the percentage of the average weekly earnings of the injured employee computed according to this section as fairly represents *the proportionate extent of the impairment of the employee's earning capacity* in the employments covered by this act in which the

several occasions that loss of wage-earning capacity is the basic criterion for determining entitlement to compensation benefits. See, e.g., *Leizerman v First Flight Freight Service*, 424 Mich 463, 473; 381 NW2d 386 (1985).[3] Thus, I agree with the majority that the first sentence of subsection 301(4) must define a disability as an inability to perform at least a single job within an employee's qualifications and training. See *ante* at 634.[4]

After establishing the proper two-part framework, however, the majority sets it aside in favor of a three-part test that it derived from its analysis of the lead

---

employee was working at the time of the personal injury. The weekly loss in wages shall be fixed as of the time of the personal injury, and determined considering the nature and extent of the personal injury. The compensation payable, when added to the employee's wage earning capacity after the personal injury in the same or other employments, shall not exceed the employee's average weekly earnings at the time of the injury. [Emphasis added.]

[3] In *Leizerman, supra* at 473, this Court stated the following:

[The] plaintiff fails to take into account the Legislature's reason for determining that wage-earning capacity, rather than actual wages earned, is the criterion by which entitlement to benefits is measured.

\*     \*     \*

Under this longstanding interpretation, loss of "wage-earning capacity" as the operative criterion for determining entitlement to benefits, serves the dual purpose of discouraging malingering and not penalizing the worker for his ability to do a job which is not available. The use of "wage-earning capacity" is not intended to compensate the worker for every employment opportunity that is lost due to injury.

[4] I also agree that the Legislature intended to abrogate the distinction between skilled and unskilled employment. See *id.* at 651-652. Further, I agree with the opinion's definitions of partial and total disability. See *id.* at 654-655.

opinion in *Sobotka, supra.* The majority concludes as follows:

> In application [of the two-part test], these basic principles operate to require that an employee must establish (1) a work-related injury, (2) subsequent loss in actual wages, and (3) a causal link between the two. Proof of the three elements will establish that an employee can no longer perform at least a single job within his qualifications and training, thus satisfying the first sentence of subsection 301(4), *and* that he has suffered a loss in wages, satisfying the second sentence of subsection 301(4). [*Ante* at 634-635 (emphasis in original).]

There is no basis in the statute for allowing this standard to replace the legislatively established one, i.e., that the employee must prove (1) a disability and then (2) a reduction of his earning capacity.

As I understand the proper system, a disability would be "*a* limitation in an employee's wage-earning capacity" under the first step, because an employee could no longer perform a single job within his qualifications and training, but this fact would not necessarily establish a loss in that employee's earning capacity when considering *all* the jobs within his qualifications and training under the second step.[5]

---

[5] The concurrence/dissent by Justice WEAVER advances the other possible understanding of the phrase "a limitation of . . . earning capacity" by arguing that whether there is a limitation "requires consideration of the effect of the work-related disease or injury on earning capacity in *all those jobs* in which the individual is qualified and trained." See *ante* at 668. I cannot accept this interpretation because it effectively renders superfluous subsection 371(1) and eliminates any separate significance to the second sentence of subsection 301(4) ("establishment of disability does not create a presumption of wage loss"). The system of the concurrence/dissent of Justice WEAVER would create a duplication: wage loss is calculated in subsection 371(1) in the same way that Justice WEAVER believes that an employee must prove a disability under subsection 301(4).

However, the majority refuses to accept the logic of its own test by rejecting this point:

> Absent postinjury employment establishing a new wage-earning capacity, benefit levels are not to be reduced by the proportionate impairment of residual wage-earning capacity. [*Ante* at 635, n 2.]

In other words, in proving a reduction in earning capacity, the employee apparently has no duty to prove that he is unable to earn the same wage for *all* the jobs within his qualifications and training. See also *ante* at 654, n 24, and 661.[6] I disagree.

In reaching its conclusion, the majority relies on the analysis of the lead opinion in *Sobotka, supra* at 27, reasoning as follows:

> [W]e rejected [in *Sobotka*] the defendant's claim that a partially disabled worker who is not receiving wages must prove that the absence of wages is due to absence of residual wage-earning capacity. [*Ante* at 658.]

This conclusion appears nowhere in the text of the lead opinion in *Sobotka*. Instead, the lead opinion only concluded that an employee need not refute that he has a *theoretical* earning capacity:

> We reject the contention . . . that plaintiff bears the burden of producing evidence of jobs he could not perform if

---

[6] The majority states:

> We reiterate that reduction in earning capacity is a different concept than residual earning capacity. [*Ante* at 654, n 24.]

> *Sobotka* furnishes no authority for the proposition that plaintiffs must prove absence of residual earning capacity, i.e., an ability to earn the same wages when considering *all* the jobs within his qualifications and training. [*Id.* at 661.]

theoretically available and that defendant's offer of evidence of plaintiff's ability in the abstract to perform some employment rebuts the inference of causation that arises from a showing of unemployment and injury. [*Id.* at 27.]

This is a different point from the one the majority makes in the instant case. I agree that an employee need not prove that he has no theoretical earning capacity and that he should not bear the burden of demonstrating that he cannot perform jobs that are not actually available to him. However, he must prove that he cannot earn wages in all the jobs within his qualifications and training *that are available.* In fact, there is support for this very point in the lead opinion of *Sobotka,* as the majority notes, where *Sobotka* quoted from *Jones v Cutler Oil Co,* 356 Mich 487, 490; 97 NW2d 74 (1959):

"[The] real inquiry [for determining loss of wages] relates to the monetary worth of the injured workman's services in the open labor market under normal employment conditions." [*Sobotka, supra* at 24-25 (BOYLE, J., lead opinion).]

The employee must prove that the injury affects his ability to earn in each of the jobs within his qualifications and training that are available to that employee. Where the employee has multiple positions that he may perform within his qualifications and training, he will have to carry his burden with respect to each position.

Of course, the lead opinion recognized in *Sobotka,* and I agree, that the employee does not bear the burden of a poor economy. Thus, if the only other positions that the employee is still able physically to perform are not available to him because of the economy, the lead opinion makes clear that he may still

fully recover. See *id.* at 27-28. I do not dispute this point. This is now the rule of law in Michigan. See *McKissack v Comprehensive Health Services of Detroit,* 447 Mich 57, 70; 523 NW2d 444 (1994).

Nevertheless, in every case in which an employee is partially disabled and unemployed, I would expect that, in order to prove a reduction in earning capacity, an employee would give testimony that either he is physically unable to perform all the jobs that he could previously perform within his qualifications and training available to him or that he has sought work for the jobs he is able to physically perform but did not receive an offer of work. The lead opinion in *Sobotka* apparently expected as much. See *id.* at 26 (BOYLE, J., lead opinion).[7] There is also the possibility that the only positions that an employee would physically be able to perform after his injury (within his qualifications and training) would be ones that do not pay the same wage as his previous job. As I understand the employee's burden of proving a reduction in earning capacity, the injured employee would be bound to seek work in these positions and, if he was able to obtain one, he would receive the difference between his previous wage and his new lesser wage in worker's compensation.[8]

---

[7] In *Sobotka, supra* at 26, Justice BOYLE noted:

For example, in the instant case *the employee presented evidence that he sought and could not obtain employment* and evidence of defendant's refusal to rehire, which has been described as strong evidence of unemployability. [Emphasis added.]

[8] Therefore, if the employee did not seek out the lesser-paying positions because of malingering, and was unemployed as a consequence, the employee would only receive worker's compensation for the reduction in his earning capacity that he suffered because of his injury, but he would not recover the remaining lesser wage that he could have earned had he

The meaning of the standard that the majority uses to determine whether there is a reduction of earning capacity, i.e., whether the employee has proven that his injury caused the subsequent wage loss, see *ante* at 661, is not clearly defined. From the majority's analysis, I do not know in what circumstances an employee will have carried this burden. I also do not know under what circumstances the magistrate has a basis on which to infer the link between the injury and actual loss of wages. I believe that the magistrate should only infer an employee's loss of earning capacity in cases in which the facts are sufficient to warrant such an inference.

Furthermore, the majority misstates the burden of proof for worker's compensation cases. In interpreting this Court's decision in *Sobotka*, the majority concluded that we determined as follows:

> Could benefits ever be denied where plaintiff was injured and unemployed? We answered: "Yes," where the defendant carries the burden of showing the plaintiff's "employability." *Fellows v Fuller Brush Co*, 1996 Mich ACO 151, 161. [*Ante* at 657.]

Thus, the majority states that *the employer, as the defendant,* carries the burden of proving the

---

sought work. See, e.g., *Williams v Blitz Construction Co*, 1995 Mich ACO 1169 (reducing an award for an unemployed, injured claimant from $250 a week to $100 a week where there was a lesser paying job actually available within the claimant's qualifications and training that he was not performing). The majority appears to reject this possibility by requiring that either this employee receive his full previous wage or nothing. See n 38 on p 662 ("Where the plaintiff is unemployed and the magistrate credits a link between disability and actual lost wages, evidence of residual earning capacity is not probative of any material issue"). This is not, in my opinion, consistent with the act's requirement that the employee demonstrate wage loss by proving a reduction in earning capacity.

employee's employability. The lead opinion in *Sobotka*, however, only recognized that a finder of fact may infer an impairment of wage-earning capacity from a partial disability where that employee shows a work-related disability and subsequent wage loss. See *Sobotka*, *supra* at 15, 25 (BOYLE, J., lead opinion). It did not indicate that an employer carries the burden of proving the employee's employability. Rather, the lead opinion only authorizes the magistrate to infer that an employee has suffered a reduction in earning capacity from the nature of the proofs establishing that he is disabled and suffered a loss in wages.

For these reasons, I cannot agree with the three-part test the majority has established, displacing the framework created by the Legislature. These disagreements have implications for the instant cases before this Court.

## II. *HASKE* AND *BAILEY*

In *Haske*, I agree with the majority that the WCAC applied the wrong definition of disability in reversing the magistrate's grant of benefits for a partial disability. However, the WCAC did find that the employee suffered no loss in earning capacity. Hence, by this finding, the employee would have suffered no wage loss as measured by the reduction of his earning capacity. Nevertheless, the WCAC's finding did not consider whether the jobs that the employee was performing were equally well paying or whether there were *available jobs* at his previous wage that the employee could perform when it determined that he suffered no loss of wage-earning capacity. Hence, I would also

affirm the Court of Appeals decision to remand to the WCAC.

In *Bailey*, I agree with the majority that the WCAC wrongly concluded that the magistrate found a partial disability. Nevertheless, I would not remand. The magistrate found that Bailey had "never testified that he could not find employment as an electrician or that he even sought such employment." As a self-employed professional, this kind of testimony would be critical for establishing a prima facie case that the injury impaired his earning capacity. Bailey has failed to provide evidence that he suffered a loss in what he is able to earn after the personal injury as an electrical contractor. Therefore, the magistrate properly denied him benefits. I believe the WCAC erred on a legal question by failing to consider whether Bailey had proven a wage loss. The Court of Appeals also erred in affirming this decision. I would reverse the WCAC and the Court of Appeals and reinstate the magistrate's refusal to grant benefits.